PeR Curiam:
This case was referred to Trial Commissioner Saul Richard Gamer with directions to make recommendation for conclusions of law on defendant’s and plaintiff’s motions for summary judgment under Rule 54(b). The commissioner has done so in a report and opinion filed on September 12,1966. Defendant filed a request for review of the commissioner’s report and recommendation for conclusions of law and the case has been submitted to the court on oral argument of plaintiff, pro se, and counsel for defendant. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, defendant’s motion for summary judgment is denied, plaintiff’s motion for summary judgment is granted and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).
*198 Commissioner Gamer’s opinion,** as modified by the court, is as follows:
Plaintiff was employed as a Supervisory Construction Management Engineer (Grade GS-12) by the Department of the Air Force at Fuchu Air Station, Japan. On July 8, 1961, he was given a “Notice of Proposed Kemoval” from his employment because of his alleged submission of false claims for reimbursement of quarters allowance. After consideration of plaintiff’s reply of July 7, 1961, plaintiff was notified on July 13,1961 that he would be removed. Plaintiff appealed this action and, in accordance with Air Force Regulations, requested a hearing before an Air Force Grievance Committee. After such a hearing, at which plaintiff was represented by counsel, the Committee recommended that the removal action be sustained and, by “Notice of Decision on Grievance” dated October 2,1961, the Commander (Headquarters, 6100th Support Wing) advised that he had decided to affirm the original decision to effect plaintiff’s removal. Plaintiff’s separation was effected on October 16, 1961. Thereupon plaintiff, a veterans preference eligible, appealed to the Twelfth Civil Service Region, San Francisco, California, which, after a hearing before an Appeals Examiner, at which plaintiff was represented by counsel, sustained the removal by decision of February 6, 1962. On May 25,1962, the Board of Appeals and Review, on plaintiff’s fro se appeal presentation, affirmed the decision of the Regional Office and on Apz-il 5, 1963 plaintiff, claiming that the agencies’ actions were procedurally defective, as well as arbitrary, capricious, and lacking in evidentiary support, filed his petition here seeking, among other things, back salary. The case is now before the court on defendant’s motion for summary judgment and plaintiff’s cross-motion.
In addition to attacking the substantiality of the evidenti-ary basis of his discharge, plaintiff’s motion enumerates several alleged procedural irregularities. As plaintiff’s then counsel observed in the hearing before the Civil Service Commission’s Regional Office,[1] plaintiff obviously has diffi *199 culty, at least at times, in expressing himself meaningfully in English, a fact which a reading of his testimony before the Air Force Grievance Board,[2] as well as of his papers submitted on the pending motions, amply demonstrates. Under the circumstances, his acting pro se on these motions has, to say the least, not served to give the court substantial assistance in understanding numerous aspects of his various contentions.[3] However, at least with respect to the alleged procedural errors, it is not necessary to attempt to analyze and consider them all because it is plain that as to one of them, which is of substantial importance, plaintiff is correct. The defect is that the bases for discharging plaintiff were not contained in, and were different from, those set forth in the charges against him. This constitutes a basic unfairness of such proportion as to warrant invalidating the discharge. Shadrick v. United States, 151 Ct. Cl. 408 (1960); Blackmar v. United States, 128 Ct. Cl. 693, 120 F. Supp. 408 (1954).
An understanding of the variance requires some consideration of the events leading up to the dismissal action.
On his arrival in Japan from Korea in March 1960 without his wife and child (who were in California), plaintiff lived in Government bachelor quarters in Tokyo. However, tt> provide suitable living quarters for his family, who were soon to arrive, plaintiff, in accordance with the pertinent Air Force Begulations, secured permission on May 12, 1960, to live in non-Government quarters. Accordingly, he was authorized to enter into a Private Rental Agreement with the owner of an unfurnished house in Hachioji, and to receive from the Air Force a Living Quarters Allowance (LQA), to be paid monthly based on the estimated cost of residing in the rented quarters (including cost of electricity and fuel), the maximum monthly rental authorized for the particular house being, in the local currency, ¥56,400, or $149.82. (At the then rate of exchange, $1 was equivalent to approximately 360 yen.) Under the system, an employee so authorized was required, every six months thereafter, to submit a Quarters Cost Report and Revised Estimate covering the previous period in which he would set forth his exact expenditures, *200 supported by paid bills or receipts. An adjustment for tbe difference between tbe amount of tbe approved monthly allowances wbicb had been paid, based on the original estimate, and the final six-month Eeport and Revised Estimate would then be made.
As it turned out, due to difficulties in obtaining furniture and other furnishings therefor, plaintiff and his family never did move into the Hachioji house (although plaintiff had paid one month’s rent thereon). Instead, after his wife and child arrived from the States in June 1960, the family lived in various hotels, waiting for the arrival of their furniture which was coming from the States, or for suitable Government quarters to become available. Finally, on July 22, 1960, they all moved into a house in Tokyo which was owned by plaintiff’s wife’s family (i.e., her brother and father).[4]
On November 17, 1960, plaintiff sought authorisation to obtain living quarters allowances, with respect to the house in which he was residing with his wife and child on a “Personally Owned Quarters” basis. Defendant’s form for “Estimate of Annual Expenditures for Quarters Allowance” contained, under the “Personally Owned Quarters” heading, the statement: “Owner of house is myself/spouse”, and the papers plaintiff executed for this purpose indicated ownership in his wife’s name. The annual cost estimate, including cost of electricity and fuel, totaled $3,040, $2,200 thereof being attributable to the purchase price (of approximately ¥8,000,000), and $840 to electricity and fuel. Under the pertinent regulations, the living quarters allowance for personally owned quarters, when such arrangement was approved by the Air Force, was based upon a formula whereby the annual allowance was one-tenth of the employee’s purchase price of the property (the monthly allowance being one-twelfth of the annual allowance).
*201 On December 6,1960, plaintiff submitted tbe required semiannual “Quarters Cost Report and Revised Estimate” covering tbe six-month period of May 1960 (wben be bad received approval to rent the Hachioji bouse) to October 31, 1960. In this form, as his “Revised Estimate”, be inserted “Quarters Cost” figures for tbe period from July 22,1960, tbe date he moved into tbe then occupied premises, to October 31, 1960, on tbe “Personally Owned Quarters” basis in conformity with tbe forms be bad executed some three weeks earlier on November 17, 1960 requesting authorization to receive reimbursement on such 'basis. For each of tbe full months of August, September and October 1960, tbe “Rent” portion of such cost was set forth as ¥100,800.
Plaintiff’s request for authority to receive living quarters allowances on a personally owned quarters basis, despite its being supported by a real estate appraiser’s certificate, dated July 15, 1960, placing a value of almost ¥7,100,000 on tbe bouse and part of tbe land involved, was disapproved on December 20, 1960. Consequently, the amount set forth on bis six-month estimate covering reimbursement on such basis for tbe July 22-October 31,1960 period was similarly disapproved and therefore not paid. Instead, plaintiff was paid for such period at tbe rate that bad been approved for tbe Hachioji bouse, this being tbe only approved living quarters allowance amount which defendant bad on file for plaintiff.[5]
Thereafter, on January 14, 1961, plaintiff obtained authority to enter into a Private Rental Agreement with Kenji Mizuta as owner (plaintiff’s father-in-law) with respect to tbe same bouse in which be resided, tbe rent not to exceed $176.07 per month, or ¥63,400, and this amount was thereafter paid to him, the new Private Rental Agreement and tbe base amount set forth therein thus superseding tbe previous one on tbe Hachioji bouse.
At about this time, an employee in the office handling private rental matters for Base personnel, in reviewing tbe documents that had been executed as hereinabove set forth, raised a question concerning the seeming inconsistency between the Personally Owned Quarters forms executed on *202 November IT, 1960, as well as the December 6,1960 six-month estimate, in which plaintiff or his wife appeared as the owner of the house, and the January 14,1961 Private Eental Agreement forms in which someone else appeared as the owner. If plaintiff or his wife was in fact the owner of the house, then plaintiff should not have received reimbursement on any Private Eental Agreement basis, as he did. Not understanding how the same house, two months apart, could, according to the records, be first self-owned and then a private rental, he referred the matter, in January 1961, to the Office of Special Investigations (OSI). This office brought the information to the attention of the Provost Marshal who requested OSI to conduct an investigation concerning the ownership of the house.
Thereupon, in June 1961, special OSI agents made certain investigations and conducted a number of interviews, including plaintiff’s father-in-law, whose name appeared on the January 14, 1961 Private Eental Agreement as the owner of the house, plaintiff’s mother-in-law, plaintiff’s wife, plaintiff’s brother-in-law, and plaintiff himself. Of these, only plaintiff’s wife and plaintiff spoke English, an interpreter being used for the others. The pertinent land 'and tax records were also checked. The land office records did not reveal who the owner of the house was, such ownership not being “registered” there. However, the tax records showed that the taxes on the property had been paid by plaintiff’s wife.
The investigation convinced defendant’s personnel concerned with the matter that either plaintiff or his wife was in fact the owner of the house, and that plaintiff therefore should not have received reimbursement on a private rental basis for any part of the six-month period covered by his December 6, 1960 “Eeport”, which related to such house. Accordingly, by an “Audit” of such Eeport, plaintiff was, on June 6,1961, notified that the “Period covering self-owned quarters” (i.e., July 22,1960 through October 31, 1960) was “disallowed”, resulting in an overpayment to plaintiff of $645.54 which would be liquidated by deductions from his salary checks. Thus, plaintiff was not allowed any living quarters allowances at all for such period.
*203 By memorandum of June 16,1961, plaintiff protested this action, stating that his Quarters Cost Report of December 6, 1960 was “inadequately prepared by me”, and that he had “committed errors in the amounts shown in the rent column for the months of August, September and October, 1960.” Plaintiff evidently thought that one reason for the disallowance was the lack of any supporting receipts for the period in question since he noted that “neither rent receipts nor other supporting evidence required by your office were received by your office.” He submitted a revised report for the 1960 six-month period involved, and attached thereto for the months of August, September and October 1960 rent receipts showing monthly payments of rent during such period at ¥60,000 (and a receipt for ¥20,000 from July 22 to August 1,1960), all signed by Kenji Mizuta.
Some three weeks later came the July 3, 1961 formal charges against plaintiff, notifying that it was proposed to remove him “for submission of false claims for reimbursement of quarters allowance pertaining to the house” in question. In compliance with the requirement of the pertinent Civil Service Commission Regulation that such notices “must state any and all reasons supporting the proposed action, specifically and in detail”,[6] the notice went on to state that plaintiff’s December 6, 1960 Cost Report and Revised Estimate claimed ownership of the house for August, September and October 1960, and claimed ¥100,800 per month as the quarters allowance based on the purchase price of the property, an amount equivalent to a $36,000 price of the property, although “A subsequent investigation disclosed that the nearest accurate figure for the cost of the house and the land to be $6,214.77”; that, after interrogation by the special *204 agent, plaintiff had, on June 16, 1961, submitted a revised cost report in which he admitted that he “had committed errors shown in the rent column for the months of August, September and October” on the previous report, and this time claimed rental, substantiated by rent receipts, of ¥60,000 per month; that the investigation made by OSI disclosed that (a) “The money for construction of the house was furnished by you and/or your wife”; (b) the taxes on the property were being paid by his wife; (c) his wife had signed her father’s name (Keirji Mizuta) to the Private Rental Agreement on the property (dated January 16,1961, which defendant had approved and which was then the basis for the current allowances) ; and (d) that “Mizuta Kenji does not own the house.”[7] The letter then concluded with the following summary statement of the charges against plaintiff:
Considering the fact that community property laws apply between husband and wife, the investigation has established beyond a reasonable doubt that the house in which you reside is owned either wholly or in part by you and that you have presented false claims for reimbursement. * * *
As such owner, the letter asserted, plaintiff “attempted to collect an amount far greater than the value of the property * * *”, and, further, later “attempted to collect the full rental allowance to which an employee is entitled” when renting property, which was “substantially higher” than plaintiff, as owner, was entitled to, i.e., “10% annually of the actual purchase price of the house.”
Thus, the crux of the charges were that (a) plaintiff (or his wife) owned the house (established by the investigation “beyond a reasonable doubt”), (b) as owner, he had claimed reimbursement on a basis far above the true house and land cost of approximately $6,200; and (c) subsequently he wrongfully claimed the allowances on a rental, rather than ownership, basis, thus giving him more than, as owner, he was really entitled to receive.
*205 By bis reply of July Y,1961,[8] plaintiff denied the charges. He submitted affidavits and statements executed by himself, his wife, and his brother-in-law, which stated that the house was owned by plaintiff’s brother-in-law and father-in-law, and that neither he nor his wife had ever furnished any of the construction money. However, by letter of July 13,1961, plaintiff was informed that the charges were “fully supported by the evidence and warrant your removal” and that he would be removed on August 5, 1961.[9]
On plaintiff’s appeal from this action and his request for a Grievance Committee hearing, the removal date was suspended. 'Such a hearing was held between August 1Y and 24, 1961, with testimony being heard over a four-day period from 10 witnesses, including plaintiff, his wife, his brother-in-law, and the two special agents who conducted the OSI investigation. A most searching examination was made of the entire history of the house and land involved, including whose money was used for original construction, subsequent alterations, additional land acquisitions, the land records and the tax records. Detailed inquiry was also made concerning all the quarters allowance papers plaintiff had signed. On the central issue involved as to the ownership of the property, it was shown conclusively that neither plaintiff nor his wife then owned the house or land, and that such ownership was in plaintiff’s brother-in-law and father-in-law. Furthermore, the evidence showed that defendant’s statement in the charges that the cost of value of the property was only around $6,200 was, considering the improvements made and current market values, far too low, and that the $22,000 (around 8,000,000 yen) set forth in the original *206 estímate of November 17, 1960 which, plaintiff had executed was a fair evaluation.[10]
Nevertheless, by a “Notice of Decision on Grievance” letter of October 2,1961, the Commander notified plaintiff that the original decision to remove plaintiff was affirmed. The letter acknowledged that “it was fairly established during the hearing that you were not the owner of the house in question.” It stated, however, that because plaintiff submitted “an official document in which” he “represented the house as self owned”, and that he “claimed the amount of 100,800 yen per month, for a period of time when you actually paid 60,000 yen per month rent as substantiated by rent receipts”, it therefore “must be concluded that you did submit false claims for reimbursement, as originally charged.”
Manifestly, this was unfair. When, as the above review makes plain, the entire proceedings against plaintiff stemmed from, and all the formal charges were grounded upon, the basic allegation that plaintiff (or his wife) was “beyond a reasonable doubt” the owner of the property, and this charge was successfully disproved (as well as, necessarily, the “cost” charges, since, as a non-owner, the house did not “cost” him anything, but also disproved anyway on a proposed cost or value basis), it was then not proper to turn around and dismiss him on grounds based upon the directly opposite and therefore inconsistent fact that he was not the owner. There was not a word in the original charges to the effect, as set forth in the Decision letter, that plaintiff “represented the house as self owned” even though in truth he was not the owner, or that, as a non-owner and renter, he improperly claimed 100,800 yen monthly for a period of time when he had actually paid only 60,000. In short, plaintiff was *207 charged with fraudulent acts committed as the alleged owner and, upon successful proof of non-ownership, was fired for alleged fraudulent acts committed as a non-owner. This fundamental variance between the charges and the actual grounds for discharging plaintiff constitutes a basic unfairness and defect in the proceedings. If defendant felt that, although the original charges proved to be groundless, it had nevertheless uncovered during the course of the wide roaming hearing different grounds for proceeding against plaintiff for submitting false claims, it should have dismissed the original charges and served new ones based on the recently-discovered evidence. This would at least have then permitted plaintiff to prepare a defense pointed to such new and different charges.
Both the Civil Service Commission’s Regional Office and Board of Appeals and Review rejected plaintiff’s contention concerning the variance. They concluded, as defendant also here argues, that the basic charge was the submission of false claims for reimbursement of quarters allowance and that this conformed to the discharge action.[11] In the broad sense, this is true, but the trouble lies in its very breadth. The point missed is that the specific acts detailed, and which allegedly constituted the basis for the false claims charge, were not the ones of which plaintiff was found guilty. Indeed, a broad charge simply expressed in terms of submission of false claims for reimbursement of quarters allowance, without some precise details, could hardly be deemed to satisfy the requirements of specificity. An employee surely would have the right to know in what respects it is alleged he erred, and what specific acts he committed that are challenged. The regulations, in requiring that the reasons supporting the proposed dismissal action must be stated “specifically and in detail (names, times, places, etc.)” so that the employee will “know the particular offenses or deficiencies charged against him, and thus be in a position to submit his defense”, cer *208 tainly would compel nullification of suclx a broad accusation. In any event, defendant here did in fact choose to base the broad charge on certain specific and detailed offenses. It was not proper, therefore, to find guilt based on other acts or offenses. Cf. Vitarelli v. Seaton, 359 U.S. 535 (1959) (a later attempted substitution of a plain discharge for a dismissal for security reasons is not permissible).
Furthermore, there is no substantial support in the record as a whole to sustain the new bases of the false claim charge upon which plaintiff was ultimately fired. A dismissal action unsupported by substantial, credible, evidence must be regarded as arbitrary and therefore cannot stand. Scott v. United States, 160 Ct. Cl. 152 (1963). Considering the record support for plaintiff’s plausible explanation as to why the documents were executed as they were, the lack of any substantial evidence of a rebuttal or contrary nature, and the agencies’ often unacceptable reasoning, it is not possible on this record to conclude that plaintiff was guilty of an intent to cheat. In a false claim case such as this one, one must necessarily look beyond cold pieces of paper and ascertain whether there was in fact a wrongful intent involved.
The Air Force final decision letter accused plaintiff of submitting “an official document in which” he “represented the house as self owned” despite the fact that he was not the owner. The letter does not identify the document in question. However, it may be presumed that the reference Was to either (1) the aforementioned form (TAB 68) headed “Authority to Enter Into Private Rental Agreement” which plaintiff executed on November 17, 1960, in which he sought authority to obtain quarters allowances on a self-owned basis, and to which was attached another form (TAB 106A) headed “Private Rental Agreement”, which plaintiff executed on the same day and to which he appended his wife’s name as “Lessee” and inserted “Self-owned” under “Lessor”, or (2) the also aforementioned December 6, 1960, semiannual “Quarters Cost Report and Revised Estimate” in which plaintiff inserted figures on a “Personally Owned Quarters” basis for the period (July 22, 1960-October 31, 1960) after he moved into the house and up to the date covered by the form.
*209 However, plaintiff’s explanation was that, at about the time he moved into the house in July 1960, he agreed to purchase the house from his brother-in-law provided defendant would give its approval to his living there and to his receiving living quarters allowances, on the self-owned formula, based on the proposed purchase price. To determine a fair sales price, plaintiff and his brother-in-law agreed that a real estate appraisal would be obtained. The appraisal, dated July 15, 1960, fixing the then value of the land upon which the house stood, the house, and the appurtenant fixtures, as ¥7,081,000, was placed in evidence at the Air Force hearing and is before the court (Ex. 5-C-4). The appraisal also placed a value of ¥8,300,000 on an adjoining parcel of land which plaintiff also considered purchasing for garage purposes. However, the house was then in the process of being altered (some ¥2,000,000 being ultimately spent on alterations), so that, when plaintiff requested defendant’s Housing Branch at the Base to make the required inspection and to give the necessary approvals, the Branch advised that the inspection would be made upon completion of the alterations. The proposed purchase price, without the adjoining land, was ¥8,000,000. In the meantime, plaintiff agreed to pay 'his brother-in-law ¥60,000 per month as rent, such amount to be applied, when and if the purchase was approved by defendant and consummated by the parties, to the purchase price on a retroactive-to-July basis.
Upon completion of the alterations, plaintiff again sought an inspection and approval of the property. His plausible explanation — and there is nothing of any substance to dispute it — is that the November 17, 1960 form was executed at the Housing Branch with the advice and assistance of its personnel, and that it was fully understood at the time that plaintiff desired to purchase the house and would do so provided defendant would approve living quarters allowances, on the self-owned formula basis, grounded upon the proposed purchase price of ¥8,000,000. Considering the July 15, 1960, real estate appraisal of over ¥7,000,000, plus the approximately ¥2,000,000 spent for alterations, the proposed purchase price of ¥8,000,000 would not appear excessive. In any event, plaintiff understandably sought approval of it *210 before he consummated the purchase. The Branch’s inspection was necessary in any event to approve or determine the amount of living quarters allowance reimbursement, whether it 'be on a rental or a self-owned basis. Two of the forms furnished plaintiff for the initiation of the inspection and the requested approval were the above-mentioned “Authority to Enter into Private Rental Agreement” and “Private Rental Agreement” forms. Plaintiff explained to the Housing officials that he planned to place the property in his wife’s name. At that time, defendant’s personnel saw no objection to this, so plaintiff inserted his wife’s name on the “Private Rental Agreement” form (Ex. 5-0-1) as “Lessee” and under “Lessor” wrote “Self-owned”.[12] He also executed at this time the aforementioned “Estimate of Annual Expenditures for Quarters Allowance Private Rental” form in which he estimated, under the “Personally Owned Quarters” heading, the sum of $2,200 per year as being the annual amount payable as quarters allowance under the above-described self-owned formula (i.e., the approximate amount that would result from an ¥8,000,000 cost to plaintiff), plus $840 additional for cost of electricity and fuel, making a total for the year of $3,040.
However, plaintiff was advised later that day that inspections or approvals would not be made on behalf of dependents and therefore the “Private Rental Agreement” form would have to be in plaintiff’s name, not his wife’s. Accordingly, plaintiff returned to the office and executed another “Private Rental Agreement” (Ex. 5-B-6) form on a self-ownership basis, but this time made out in his own name.[13]
*211 Three weeks later came the December 6, 1960 semiannual “Cost Report and Revised Estimate”. Although his “Request” to receive allowances on a self-ownership basis at the proposed purchase price figure had not as yet been approved, plaintiff, in conformity with the request, inserted allowance figures calculated on such basis (this time, however, plaintiff included the 3,300,000 yen for the adjoining property in the total cost, and came out with a monthly figure, on the formula basis of 100,800 yen). Contrary to the accusation made by the Management Representative at the hearing (Ex. 4, Hearing Transcript, p. 196), who appeared to be acting in the capacity of prosecuting attorney, plaintiff did not know at that time that the proposed purchase would not be approved. Plaintiff did not learn this until approximately December 20, 1960, which the form itself shows was the disapproval date (Ex. 5-C-7). There is no showing that, if the “Request”, now outstanding for some three weeks, would be approved, this basis of calculation would not have been considered applicable for such period since plaintiff and his family had actually lived in the house during such time and he would have taken title, in accordance with the conditional sales agreement he had with his brother-in-law, as of the beginning of such period. But even if it were not, this would not constitute fraud or the submission of a false claim. A mistaken application of a certain rate, were it to be approved, to a certain period, is surely not to be equated with the filing of a false claim. In similar false claim proceedings, whether expressed in terms of “intent to defraud” (United States v. Park Motors, Inc., 107 F. Supp. 168 (E.D. Tenn. 1952)), or the knowing presentation of a claim that is false (United States v. Fox Lake State Bank, 225 F. Supp. 723 (N.D. Ill. 1963)), there must be something in the nature of “the necessary scienter” or “guilty knowledge” (United States v. Ueber, 299 F. 2d 310, 314 (6th Cir. 1962)).
Thus, there is simply no warrant, on this record, for discharging plaintiff for submitting “an official document in which you represented the house as self owned”. There was no such “representation” at all. The submission of papers executed in such fashion only for the purpose of seeking permission to become a self-owner did not constitute a repre *212 sentation that he already owned the house. And similarly, it is not fair to describe the December 6,1960 form as one in which plaintiff “claimed the amount of 100,800 yen per month, for a period of time when you had actually paid 60,000 yen per month * * *.” Obviously, plaintiff was “claiming” 100,800 yen per month only if his application were approved and in accordance with the self-ownership formula.
What makes these charges all the more inexplicable is that at least certain of defendant’s employees seemingly full well knew the purpose of the papers and figures in question. No one was fooled by them. Plaintiff did not receive 100,800 yen for any month. Those papers were held and not processed since plaintiff’s application had not been as yet approved. And when the application was finally rejected (the proposed purchase price presumably being considered excessive), plaintiff was actually reimbursed for the period in question on the basis of the only approved Private Rental Agreement which the pay officials then had on file, i.e., the May 12,1960 one.
In this connection, it is noted that under the agreement approved May 12,1960, defendant paid plaintiff only 56,400 yen, or $149.82, per month, the rate applicable to a house in which he never lived, although defendant concedes plaintiff actually paid 60,000 yen monthly on the house in which he did live during the period in question. And when, after plaintiff’s self-ownership request was denied, and defendant, at plaintiff’s further request, made a reinspection of the house to fix reimbursement on a rental basis, a monthly rental allowance of 63,400 yen, or $176.07, was approved for payment after January 17, 1961. Certainly, the 56,400 yen monthly rate which defendant, on the basis of its unilateral action, approved and paid for the 1960 period in question, and which plaintiff accepted without complaint, was modest. These are hardly the actions of a man trying to cheat or to obtain excessive amounts. And yet, as a result of its action herein, defendant has now even recouped that amount in full, thus giving plaintiff no quarters allowances at all for the more than three-month period here involved. Was it thought that plaintiff could provide shelter for himself and his family without any cost — with respect to the same house on which *213 it was currently allowing the greater amount of 63,400 yen per month? Of course, that recoupment was made on the theory that plaintiff should not have received “rental” reimbursement in any amount on a house he allegedly owned (although, inconsistently, defendant made no complaint about the rental payments being currently made to plaintiff, and which had been made since January 1961). But even defendant how concedes the factual error underlying this theory.
Defendant rejects plaintiff’s explanation that the papers on which it relies as constituting false claims related to a “proposed” purchase. It says plaintiff sought to deceive it by representing himself as the owner, and thereby attempting to collect 100,800 yen instead of the 60,000 yen he was in fact paying. But the whole record supports plaintiff’s entirely plausible explanation. One of defendant’s important witnesses at the Grievance Hearing, the Chief of the Employee Services Section, which section handled certain phases of quarters allowance matters, admitted there was nothing wrong in an employee’s submitting a proposed purchase for approval in order to ascertain if the price would be acceptable as the basis for quarters allowances under the self-ownership formula (Grievance Hearing, Tr. p. 75).
Plaintiff did not select or compose the forms he filled out for the various purposes. Defendant had no special forms relating to approvals of proposed purchases. Plaintiff executed those forms which defendant supplied for the purpose. Plaintiff’s reasonable explanation is supported by all the exhibits placed in proper context and no rational basis is shown for rejecting it. Where one is being accused of attempting to cheat his Government by submitting false claims, with a whole career in jeopardy, the evidence to support the charge ought to be clear and convincing. Ordinarily, the Government, in a proceeding under the False Claims Act (31 U.S.O. §231), for instance, is required to meet “the burden applicable to any fraud action, statutory or common law” by proof that is “clear, unequivocal, and convincing.” United States v. Ueber, supra, at 315. While it may be true that a discharge proceeding is not to be equated in all respects with a criminal proceeding, Finn v. United *214 States, 152 Ct. Cl. 1 (1961), (the knowing submission of “false, fictitious or fraudulent claims” is a crime under 18 U.S.C. §§ 287 and 1001) or even with a civil proceeding under the False Claims Act, nevertheless when, on a similar false claim charge, a Government employee’s job, and possibly his entire future, is at stake, the proof of attempting to cheat should certainly also be at least clear and convincing. Cf. Garrott v. United States, 169 Ct. Cl. 186, 340 F. 2d 615 (1965).
Indeed, although defendant insists on rejecting plausible and supported explanations, with no sound reason shown for such disbelief, some of the testimony it produced at the Grievance Hearing and upon which it relies is so farfetched as to compel its repudiation. For instance, one witness testified that payment of allowances on the self-ownership formula was automatic upon the employee’s bringing in proof of purchase, and “regardless of the price” paid (Tr., p. 77). And additional testimony was to the effect that when plaintiff was asked for such proof of ownership or purchase, he instead submitted the aforementioned real estate appraisal, which was in Japanese. Defendant thus accuses plaintiff of pretending, in furtherance of the scheme to defraud, that the appraisal constituted a deed to the property. This testimony evidently was elicited to rebut plaintiff’s contention that he was seeking approval of a proposed purchase, and to show that plaintiff was instead attempting to pass off an appraisal as a deed. All of this testimony must be rejected. Certainly defendant would not pay allowances based on any kind of expensive house an employee decided to purchase. The pertinent regulations governed the “applicable rates of payment”, and vested broad authority in designated officials to administer the quarters allowances programs (Exhibits 17 and 18). Obviously, the price of the property, which fixed the amount of the monthly allowance which defendant would pay, was all important. It may well have been that the particular section in which the witness functioned had no responsibility for approving quarters allowance amounts, and this may have been what the witness meant, but it certainly was not true that the Air Force itself *215 made no such, determinations. (The record indicates it was the Housing Branch at the Base which was responsible for approving the amounts of the allowances. It does not appear that anyone from this Branch was called to testify at the Grievance Hearing.) And manifestly the appraisal was here submitted in justification of the amount plaintiff proposed to pay for the property. How could plaintiff possibly have thought, as defendant charges, that he would be able, in Japan, and in offices which included Japanese personnel, to pass off a real estate appraisal as a deed or bill of sale, even though the appraisal was in Japanese? It is quite difficult to believe that plaintiff, a GS-12 engineer, would commit an act of such stupidity. Indeed, on the basic issue involved, in view of the ability, normally, to ascertain who the owner of property is, it hardly seems credible that plaintiff would attempt to pose as the owner of property in order to obtain greater reimbursement on a formula basis which defendant had never approved. In this connection, the agencies throughout have referred to and relied upon plaintiff’s failure to submit proof of ownership. For instance, in the decision of the Regional Office of the Civil Service Commission, it is stated: “The evidence in the appeal file shows that although appellant attempted to claim self ownership of the house * * * in a private rental agreement submitted to his agency on 17 November 1960, he failed to submit satisfactory proof of ownership in spite of the fact that this requirement was specifically brought to his attention. For that reason, we cannot accept appellant’s contention that he felt warranted in claiming reimbursement on the basis of privately owned quarters in submitting his claim of 6 December 1960” (Exhibit 11). The contention cannot be understood. The failure to submit proof of ownership is a point in plaintiff’s favor, not defendant’s. It shows plaintiff never claimed to be the owner. Such proof was not submitted because it could not be until defendant approved and the transaction was completed. There was, for instance, no attempt to present a false bill of sale or other evidence of ownership. It also shows that defendant, by holding the papers, knew the claim was not to be processed until plain *216 tiff did submit such, proof, and that plaintiff also knew the papers were being held. It thus supports plaintiff’s explanation that he did not expect to receive any amount on the self-ownership formula until defendant did approve and plaintiff did bring in satisfactory proof of ownership. It is hardly fair to turn plaintiff’s honest conduct in this regard against him.
Defendant makes much of the fact that plaintiff admitted in his Revised Cost Report of June 16,1961, which was supported by the 60,000 yen per month rent receipts, that he “committed errors” on his original December 6, 1960 Cost Report. The decision of the Civil Service Commission Regional Office stressed this admission. There was a large amount of testimony and explanation concerning the “mistake” or “errors” plaintiff admitted. The record is far from satisfactory on the point of what the “mistake” was that plaintiff was. admitting. However, plaintiff’s Revised Cost Report is fairly susceptible to the construction that plaintiff was conceding he should not have filled in 100,800 yen per month for the period in question, and his testimony at the Grievance Hearing was also to such effect. What plaintiff apparently meant was that, since his self-ownership application had not yet been approved, and since he had actually paid rent during such period of 60,000 yen, the submission should have been for the 60,000. He evidently also meant that, since cost reports should be substantiated by approved agreements or receipts, and at the time he had neither to justify the 100,800 yen figure, he should instead have inserted the figure of 60,000 yen, which could have been substantiated by the receipts he was then submitting with his Revised Cost Estimate. It must be remembered that the Revised Cost Report was submitted many months later, on June 16,1961, in response to defendant’s action of June 6, 1961, in depriving plaintiff of any quarters allowance for a period that was now almost a year ago. As shown, defendant had paid plaintiff only 56,400 yen monthly for the period. Now it was disallowing and recouping the entire amount paid for the period on the erroneous grounds that during such time the quarters were *217 self-owned. Plaintiff was in effect merely replying that the quarters had not been self-owned, but conceded that, since they were not, and the approval for his self-ownership request had not as yet been given, he should have requested reimbursement on the 60,000 yen basis, which he was now claiming. Perhaps, upon the disapproval of plaintiff’s request on December 20, 1960 and following plaintiff’s new request of January 14, 1961, for approval of the Private Dental Agreement, it would have been better had plaintiff at that time also resubmitted a revised Cost Deport with the 60,000 yen figure, supported by receipts.[14] However, since defendant had, upon the disapproval of plaintiff’s self-ownership request, itself decided to pay him 56,400 yen monthly for such period, there would not seem to have been any reason for a revised submission, since plaintiff was accepting that lower figure. Plaintiff obviously believed that, with the disapproval of his request, such 56,400 yen amount, which was contained in the only approved Dental Agreement form defendant then had on file, automatically became applicable. He was justified in so believing because that was the very way defendant had actually handled the matter.
In any event, while plaintiff may then have thought or conceded that the insertion of the 100,800 yen figure, which was based on the proposed purchase price, was a “mistake” (in the absence of approval of the purchase price, it was never actually necessary for defendant to make a ruling on the point of applicability of the allowances on the formula basis to the date of occupancy under a conditional purchase agreement), it could hardly be deemed to constitute an admission of fraud or an intent to cheat. If every mistake made by Government employees on reimbursement claim forms constituted the documents “false claims” subjecting *218 the employees to dismissal, the turnover in Government personnel would be staggering.[15]
And, further, in this important respect plaintiff appears to have been deprived of the kind of Civil Service Commission review to which he was entitled under the Veterans’ Preference Act (5 U.S.C. § 863). The Civil Service Commission’s Board of Appeals and Review, as is indicated by the following quotation from its decision denying relief to plaintiff, quite apparently misconceived the basic nature of the proceeding against plaintiff:
In conclusion, you state that you did not submit false claims for reimbursement of quarters allowance and that it has not been established, beyond a reasonable doubt, that you reported false information to the Government, and hence, no act of fraud exists. Since you have not been charged with fraudulent actions, it is not necessary to resolve that issue. As heretofore indicated, the charge against you was the submission of false claims for reimbursement of quarters allowance and that is the only issue to be resolved. (Exhibit 13, p. 4.)
Thus, the Board made a sharp distinction between “an act of fraud” and “the submission of false claims.” If by this distinction the Board meant to hold that, regardless of any wrongful motive or intent, plaintiff would still be subject to dismissal if the reimbursement papers he submitted contained innocent mistakes or were otherwise not in approvable form, then it plainly erred. The very essence of the original charge against plaintiff was that he attempted to cheat by submitting a false claim — “you have attempted to collect an amount far greater than the value of the property would have allowed had you been able to prove full ownership.” The Air Force’s final decision concluded that “you did submit false claims for reimbursement, as originally charged.” As *219 tbe agency wbicb preferred tbe charges, it bad not made any sncb technical distinction. It considered that plaintiff was being charged with fraud. It flatly told tbe Commission’s Regional Office on its submission in response to plaintiff’s appeal: “Tbe real purpose [of tbe investigation against plaintiff] was to determine whether a fraud bad been perpetrated against the United States Government.”[16] (Exhibit 10.) Since plaintiff was charged with an intent to cheat, and was discharged with a finding that such charge was sustained, the Commission’s Board of Appeals and Review should have considered the existence of such a guilty intent as the pivotal issue in the case.
If, on the other hand, the executive branch wishes to punish its veterans preference employees for false statements made without guilty intent, at least, that purpose should be put up to them squarely in the notice of proposed removal. Such a Draconian rule may raise constitutional issues under some circumstances. Cf. Shaw v. United States, 174 Ct. Cl. 899, 357 F. 2d 949 (1966); Swaaley v. United States, decided today, ante, p. 1. The subject requires clarity of thought and precision of language which here, as in Swaaley, supra, seems to have been lacking.
Thus, there was an important error in the Commission’s handling of plaintiff’s appeal. A basic defect in the Commission’s appellate review proceedings which substantially affects a veteran’s rights will serve to invalidate his discharge. Blackmar v. United States, supra, at 706-707.
For all of the above reasons, defendant’s motion for summary judgment should be denied and plaintiff’s similar motion should be granted, with the amount of the recovery to be determined in further proceedings under Rule 47 (c).

The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 54(b). The facts are stated in the opinion.

 Exhibit IX to defendant’s motion. Plaintiff, a citizen of the United States, was born in Mexico.

 Exhibit 4 to defendant’s motion, pp. 189-197; 20-1 — 232.

 Plaintiff has had, at various times, three different attorneys of record in this case. He has dismissed them all.

 Plaintiff, then a tourist, marries his wife, who was of Japanese ancestry, in 1953. He commenced working with the Army in Tokyo in 1954. In 1957, he went to Korea with the Army Engineers. While plaintiff was in Korea, his wife continued to reside in Japan. The house in question was built in 1957, and thereafter that was where she resided until November 1959, when she left for the States with plaintiff, plaintiff having completed two years’ service in Korea, upon the expiration of his leave in the States, plaintiff returned to Korea, but then, on March 14, 1960, transferred from his Army position in Korea to his Air Force post in Japan. It was then that he decided to bring his wife and child back to Japan.

For the previous period during which plaintiff and his family had resided in hotels, plaintiff submitted receipts covering the expenses incurred, and reimbursement therefor was made.

 The section reads in pertinent part as follows:
“The notice must state any and all reasons supporting the proposed action, specifically and in detail (names, times, places, etc.). The reasons must be given specifically enough, and in sufficient detail, that the employee may understand clearly the alleged grounds for the proposed action, know the particular offenses or deficiencies charged against him, and thus be in a position to submit his defense. * * * if a flaw is detected in the notice, whether as a result of a request for further explanation or otherwise, the faulty notice should be cancelled and a new notice issued. * * *” (Federal Personnel Manual, Appendix C to Section 5, Procedures under Part 22, Sec. A.2. (Exhibit 21).)

 Further specifications referred to alleged statements of plaintiff concerning ownership of the house, his refusal to sign written statements, and, after being interviewed for a while by the special agents, his refusal to answer further questions.

 The Proposed Removal Notice of July 3, 1961 gave plaintiff seven days to reply. This appears to have been a violation of the aforesaid Civil Service “Appendix C” Regulations which provide (par. A.3.) that “At least 10 calendar days should be allowed for a written reply wherever possible * * *” (Exhibit 21). However, plaintiff does not make a point of this matter. Actually, he submitted his answer in four days.

 Prior to the sending of the letter, a memorandum dated July 13, 1961 to the Chief of the Civilian Personnel Bivision, who was acting for the Commander on this matter, was written by an employee who was presumably assigned the task of reviewing the matter. The memorandum stated: “It has been established beyond a reasonable doubt that” plaintiff owned the house, that he submitted false claims for reimbursement on a Personally Owned Quarters basis, and that “He submitted false claims for reimbursement of Private Rental Allowance while occupying self-owned quarters.”

 In July 1960, when his family moved in, plaintiff wanted to purchase the house, and a real estate appraisal dated July 15, 1960, was obtained setting a value of ¥7,081,000 on the property. Thereafter, around ¥2,000,000 was spent on remodeling the property. Thus, after the alterations, the property was, on these bases, worth over ¥9,000,000. After the alterations were completed, the brother-in-law listed the property for sale for ¥12,000,000, or around $33,500, although it is not clear whether this figure included a parcel of adjoining land which the real estate appraiser valued at 3,300,000 yen. In any event, on this family transaction the owners (father and brother) agreed to sell the property to plaintiff and his wife for ¥8,000,000, or approximately $22,000, the figure plaintiff used in his November 17, 1960 cost estimate.

 The Regional Office construed the charge to consist of “submission of false claims for reimbursement of quarters allowance pertaining to a house located at * * *” (Exhibit 11, p. 2). The Board of Appeals and Review interpreted it as follows: “The basic charge for your removal as reflected in the advance notice dated July 3, 1961, was the submission of false claims for reimbursement of quarters allowance” (Exhibit 13, p. 3).

 At the Grievance Hearing, defendant proved conclusively through laboratory reports and testimony that it was plaintiff who had written in his wife’s name on this form, a fact which the record fails to disclose plaintiff had ever denied.

 Probably the employee who, on the basis only of how the documents appeared on their face, became concerned and therefore initiated the investigation, was confused or unduly influenced by the Rental Agreement form which was originally executed in plaintiff’s wife’s name. Por some reason, at least up to the Grievance Hearing, the employees engaged in prosecuting or testifying against plaintiff were unaware of the existence of the same form executed the same day but under plaintiff’s own name and which was supposed to substitute for the earlier one, for it was plaintiff who was obliged to introduce the second document in evidence.

There has been much controversy over whether plaintiff knew of the existence of the 60,000 yen rent receipts, and if so, when he was first apprised thereof. However, the entire point is unimportant. Whether or not he knew of the actual existence or whereabouts of such receipts as of December 6, 1960 (plaintiff says that since these were in Japanese and concerned Japanese currency amounts, he left such details to his wife), he knew that such amounts were being paid and that, if the purchase price would he approved, they would be credited thereon. Receipts or no receipts, plaintiff has never denied knowledge of the payment of such sums.

 There was also reference by plaintiff at the hearing to a "slide rule error” he made in calculating the figure of 100,800 yen (Transcript, p. 13) as well as references thereto by him in the Civil Service Commission proceedings. (Exhibit 12, plaintiff’s appeal, p. 6.) Plaintiff says he used a slide rule to convert the proposed purchase price to a monthly figure on the formula basis, and by a slight error came out to the figure of 100,800 yen. He says the correct figure should have been 94,165 yen. However, this is unimportant. The original complaint concerned plaintiff’s receipt of any amounts on a rental rather than a self-ownership basis, and the current complaint is that, as a renter, an amount in excess of 60,000 yen was claimed. Defendant’s contention would be the same whether such excess was based on 100,800 or 94,165 yen.

 The agency’s full statement was as follows :
“* * * The purpose of the [OSI] Investigation * * * was not an effort to prove that Mr. ürbina either owned or did not own the house. The real purpose, of course, was to determine whether a fraud had been perpetrated against the united States Government.”
This cannot be understood, since the basic reason for charging plaintiff with fraud was that the investigation, in the agency’s belief, “established beyond a reasonable doubt” that plaintiff (or his wife) did own the house. What is clear, however, is that the agency now felt that, whether or not he was the owner, a fraud had been committed against the Government.