Seth M. Kalberg, Jr., Boston, Mass., on brief for petitioner.

Edward F. Harrington, U. S. Atty., Gregory C. Flynn, Asst. U. S. Atty., Boston, Mass., Jesse L. Butler and Lawrence A. Dinerstein, Attys., U. S. Postal Service, Washington, D. C., on brief for respondent.

**Thomas A. McDONOUGH, Petitioner,**

v.

**UNITED STATES POSTAL SERVICE, Respondent.**

No. 81–1037.

United States Court of Appeals, First Circuit.

Submitted Sept. 18, 1981.

Decided Nov. 18, 1981.

Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The petitioner in this case, Thomas McDonough, suffers from what has been diagnosed as "borderline personality—anxiety neurosis." This emotional illness has made it difficult for him to work steadily. In February 1978, the U.S. Post Office at Buzzards Bay, Massachusetts, hired him to work as a mail handler and, three months later, as a distribution clerk. But, in early November, after less than nine months employment, he had to take leave for treatment of his emotional illness. He reappeared at work in mid-January 1979, but after working only three and one-half days in the week, he told his supervisor that he was sick and left. About six weeks later, the Buzzards Bay Postmaster noticed McDonough's name and picture in a local newspaper as a candidate for selectman in a nearby town. On March 5, 1979, the Post-

master wrote to McDonough asking him to "submit to this office within five (5) days, medical certification from your attending physician to cover your absences from 1/16/79 to present." Subsequently, the Postmaster determined that McDonough had not supplied the necessary certification and brought charges against him seeking his removal from the Postal Service. After a hearing, a Merit Systems Protection Board officer determined that the removal was justified. This decision was affirmed by the Board on appeal. Petitioner now seeks review of the Board's decision under 5 U.S.C. § 7703(b)(1).

■ At the outset it is important to understand that the Service did not discharge McDonough because of any physical or mental inability to do his job. Rather, it dismissed him for two specific reasons. As described in the Postmaster's charges, first sent to McDonough on March 26, 1979, they are:

Charge No. 1: You have been absent without official leave since January 17, 1979.

Charge No. 2: You failed to respond to letter sent to you on March 5, 1979, requesting medical certification from your attending physician within five (5) days, covering your absences from January 16, 1979 to the present.

The Postmaster concluded that these charges were substantiated and dismissed McDonough. The hearing officer upheld the Postmaster's decision on the ground that it was not "arbitrary, capricious or

unreasonable." On review, however, the Board pointed out that this standard was incorrect: the Board is to hear this type of case *de novo* and to insist that the Postmaster prove his charges by a preponderance of the evidence. *See* 5 U.S.C. § 7701(c)(1)(B). Nevertheless, after reviewing the officer's initial decision and the whole record, the Board determined that the charges were supported by a "preponderance of the evidence."[1]

The issue before us on review is whether, on the basis of the record before it, the Board could find that the charges were supported by a "preponderance of the evidence," or whether the Board decision was "arbitrary, capricious, an abuse of discretion," or (insofar as factual matters are at issue) "unsupported by substantial evidence." 5 U.S.C. § 7703(c). What that comes down to, in this instance, is whether or not the Board's decision is reasonable. We believe that it is.

The record in this case, which we have read in its entirety and with care, leads us to draw two preliminary conclusions. First, although it is clear that McDonough is technically guilty of "Charge No. 2" in that he did not provide medical certification within five days of receiving a request for it, the Board did not interpret that charge with literal strictness. Rather, it interpreted it as requiring certification within a reasonable time, and it still sustained the charge on the ground that McDonough did not provide certification within a reasonable period.[2]

---

1. The Board, like any other agency, is entitled to substitute its judgment for that of one of its hearing examiners. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). *See also* 5 U.S.C. § 7701(b) ("The Board may hear any case appealed to it or may refer the case to an ... employee of the Board designated by the Board to hear such cases ..."); 5 C.F.R. §§ 1201.113 (the hearing examiner's decision becomes the "final" decision unless the Board grants a petition for review, in which case the Board's decision becomes the "final" decision) and 1201.-116 ("The Board may affirm, reverse, remand, modify or vacate [a hearing examiner's decision] in whole or in part."); and *Fass v. Ruegg*, 379 F.2d 216, 220 (6th Cir. 1967).

2. The Board's interpretation of the second charge against McDonough is eminently sensible. McDonough argues that it would be highly unreasonable, indeed arbitrary, to impose a penalty as serious as discharge merely for missing a deadline of the type contained in the Postmaster's March 5 letter. As applied to his case, McDonough's argument is particularly strong, for mental confusion arguably made it difficult for him to understand, and to respond appropriately to, the Postmaster's request.

On a related point, there is implied in what McDonough writes a suggestion that the Postmaster wished to remove him precisely *because* he was ill but that the Postmaster would not actually come out and say so. Be that as it may, the Board and this court must decide

Second, the two charges against McDonough are really one. If McDonough did not provide adequate medical certification for his absence within a reasonable time, he was AWOL, but not otherwise. The only real issue here is whether McDonough provided such certification. The Board concluded that he did not, and we take this to be the finding from which McDonough appeals. Thus, we are essentially deciding whether the Board could find that McDonough did not provide adequate medical documentation for his seven week absence within a reasonable time.

We first look at the documentation that McDonough supplied at some time or other:

On January 4, 1979, before the absence at issue, he provided the Postmaster with a note from his doctor, Joseph Kreplick. It stated:

> Mr. McDonough has been ill requiring weekly OPD sessions at R.I.V.A. Hospital —Dr. Adler—as well as frequent psychiatric sessions by Dr. Joe Kreplick. The major factor in his decompensation has been a total disruption of his marital situation.
>
> At present he is living alone in Pocasset and is mentally clear. He should return to work as soon as possible with possible light duty (minimize stress) for 2 weeks and then he can resume his regular job.

On March 26, 1979, about three weeks after the Postmaster wrote to McDonough, he received a letter from McDonough, which stated:

> Dear Mr. Monteiro;
>
> My doctor, Jos. Kreplick (295–4474), Cranberry Hgwy, Wareham, does not feel that I'm ready to return to duty yet.

After the Postmaster had sent McDonough notice of the charges on March 26, the Postmaster received a note from Dr. Kreplick, dated April 2, which said,

> Pt is under my psychiatric care on a weekly basis and recently was an inpt at R.I.V.A. Hosp. He is showing poor cop-

ing, poor judgment, confusion, and is unable to work for an Indefinite Period.

Dr. Kreplick wrote a letter on July 9, 1979, four months after the Postmaster requested medical certification. It stated:

> Mr. T.A. McDonough is a 50% V.A. S.c'd for Anxiety Neurosis whose condition has been 'aggravated' by what was for him stressful work conditions (person experienced 'pressure'). He had been under my psychiatric care prior to, and since going to work for the Post Office. The job was good for him for the first 6 months. However, he then overcompensated for his age and feelings of inadequacy by assuming various duties that overextended him emotionally. I had seen him and prescribed anti-anxiety drugs (daily) over a period of many months as his condition worsened. By Nov. '78 it was my professional opinion that he needed Inpt R.I. V.A. Hospital care. He was confused during this period & showed poor judgment—signing himself out after one day to get O.P.D. care. He saw me on 1–17–79 having left work because of 'being disorganized.' I had seen him twice the week before. His medication was raised to Antipsychotic levels in Jan. '79.
>
> He is now taking a third of the medication previously needed & I suggest he work 4 hrs per day × 5 days per wk for the next 6 months. I shall continue to treat him regularly.

Dr. Kreplick submitted a government disability form, on July 27, 1979. Under the heading "describe the onset of disability," Dr. Kreplick wrote:

> Pt is 50% serv. comp. vet. for anx. neurosis 50%. Started work Feb. '78 and was aware of inc. anx. in Oct. '78. Went to Ireland for 1 wk rest & vacation & came back to work—felt worse. VA Hosp. OPD (I advised Inpt) in Nov.— worse (psychotic)—poor judgment—finally in V.A.R.I. Hosp. 1 day Jan. '79 (voluntary)—signed self out.

whether the record evidence supports the charges actually made and thereby provides an adequate basis for dismissal. *See Washington*

*v. Summerfield*, 228 F.2d 452 (D.C.Cir.1955); *Saggau v. Young*, 138 F.Supp. 140 (D.D.C. 1956), aff'd, 240 F.2d 865 (D.C.Cir.1956).

Under the heading "Diagnosis" Dr. Kreplick wrote: "Borderline Personality—Anxiety Neurosis (Alcohol avoidance—Past history)." Dr. Kreplick checked the "yes" box under "disabled" and in the box asking for the likely duration of the disability, he wrote "indefinite."

The record also contains an accident report form, apparently submitted by Dr. Kreplick to an insurance company in October 1979. It states that McDonough was in some kind of auto accident on January 18, 1979; that he suffered "anx neurosis (aggravated)—soft tissue damage to neck, back, knees, arms;" that the symptoms first appeared on January 17, 1979; that the patient never before suffered a similar condition; and that $400 is due Dr. Kreplick for seeing McDonough three times in January (on the 18th, 24th and 25th), three times in March (on the 12th, 19th and 26th) and twice in April (on the 2nd and 13th). In response to the question: "Patient was disabled (unable to work) from: ___ through: ___," Dr. Kreplick entered the dates 1/17/79 and 4/13/79, respectively. And, in response to the question: "If still disabled, date patient should be able to return to work: ___," Dr. Kreplick entered the date 4–13–79. The Board did not allow this report into evidence on the ground that McDonough did not use due diligence in attempting to obtain it.

█ The Board found that this certification, some of which was submitted prior to McDonough's absence and most of which was submitted several months after the Postmaster's request, did not constitute the submission of adequate medical certification within a reasonable time. Although the issue is a close one, we believe the Board's finding adequately supported for two reasons. First, as the Board pointed out, nowhere does Dr. Kreplick specifically certify to the Postmaster that McDonough was unable to work from January 17, 1979 to March 5, 1979. The closest he comes to saying this is in his April 2 note, in which he states that McDonough "*is* unable to work for an indefinite period." (Emphasis added.) If this statement stood alone, it might be taken as ample certification inelegantly expressed. But, the Board could reasonably read this statement more literally *not* to refer to the period of absence because of several other facts. For one thing, on January 4, Dr. Kreplick wrote that McDonough *should* return to work. For another, on July 9, Dr. Kreplick wrote a long, detailed account of McDonough's illness for the postal authorities. In that account he recommended McDonough return to work, if only on a part-time basis, and *he nowhere stated that McDonough had been unable to work from January 17 through March 5.* Dr. Kreplick's July 27 report refers to McDonough as "disabled" for an "indefinite" period, yet Dr. Kreplick *cannot* have meant by this that McDonough could not work for he had (in his letter of July 9) just recommended that McDonough return to work (and McDonough did so on July 11, 1979).

It is not as if Dr. Kreplick were unaware of McDonough's need for medical certification to cover his absence. McDonough appears to have been well-represented by union counsel. In fact, in petitioning the Board for review of the hearing examiner's decision, McDonough's legal representative wrote that "[n]umerous attempts were made . . . to have Dr. Kreplick write a resume regarding the treatment dates and condition . . . during the period January 17, 1979 through March 5, 1979. Dr. Kreplick finally agreed . . . [but the letter he issued] did not contain the information requested." In sum, Dr. Kreplick's "certifications," as revealed by the record, provide confusion, not enlightenment.

Dr. Kreplick's behavior is susceptible to different interpretations. Perhaps he simply did not understand what he was asked to do. Perhaps he was trying to help McDonough by stressing McDonough's illness when he felt that would keep him from being fired while stressing his health when he felt that might get him rehired. Or, perhaps Dr. Kreplick felt that in good conscience he could not certify that McDonough was unable to work from January 18 through March 5. The main source of con-

fusion is Dr. Kreplick's certifications. He might have clarified the meaning of his April 2 note had he testified. Yet, it was McDonough's responsibility to secure that testimony, just as it was his responsibility to secure adequate and timely medical certification in the first place. The Board's rules provide discovery procedures and subpoenas to obtain such evidence. *See* 5 C.F.R. §§ 1201.73–75, 1201.81–85. There is no indication that McDonough or his counsel sought to use them.[3]

Second, McDonough produced no certification at all until April. He states that he was too confused to understand what he was to do. Yet, Dr. Kreplick did not suggest any such degree of confusion. Moreover, during the period of absence at issue, McDonough took out nomination papers for selectman, found the necessary signatures, placed ads in the newspapers, and attended at least one candidates' night. Of course, the fact that McDonough ran for office does not prove that he was able to work during that time. A mentally unbalanced person may run for political office, and even get elected. Yet, these activities suggest a fair degree of rationality.

Thus, very different conclusions might reasonably be drawn from the evidence in the record. We cannot say that it was unreasonable for the Board to determine that a preponderance of the evidence shows that petitioner did not provide adequate medical documentation within a reasonable time. The record in its present state suggests that rather doubtful certification was obtained quite a long time after it was requested under circumstances that do not clearly excuse the delay.[4] We therefore affirm the Board's decision.

*Affirmed.*

---

3. The accident report is unlikely to have helped McDonough significantly had it been admitted into evidence for it simply adds to the confusion. As indicated above, Dr. Kreplick certified on that report—if nowhere else in the record—that McDonough was disabled and unable to work from January 17 through April 13, 1979. The report, however, also suggests that Dr. Kreplick did not *see* McDonough at any time between January 25 and March 12, and offers little, if any, basis for believing that McDonough was so incapacitated throughout January, February and especially March that he could not at least have informed the Postal Service of his condition or provided the Postmaster with the medical certification he had requested. Moreover, the statement in the accident report that McDonough *is* able to work after April 13 seems to contradict Dr. Kreplick's April 2 statement that McDonough "is unable to work for an indefinite period." Nor does one quite know what to make of the fact that no other mention of any auto accident appears in the record. In any event, McDonough does not attack the Board's decision not to admit the accident report into evidence, and we see no basis for doing so.

4. McDonough argues that the penalty of discharge is so disproportionate to the offenses with which he is charged as to be an abuse of discretion. We disagree. Absent unusual circumstances, a reviewing court "will normally defer to the administrative judgment on appropriate corrective action...." *Rotolo v. Merit Systems Protection Board,* 636 F.2d 6, 8 (1st Cir. 1980) (quoting *Giles v. United States,* 553 F.2d 647, 650 (Ct.Cl.1977)). Contrary to the intimation in McDonough's brief, his case does not fall within an exception to the general rule of deference merely because the derelictions with which he is charged are "more akin to negligence than [to] an attempt intentionally to deceive or defraud the agency." Regardless of how one nominally characterizes the unexcused failure to submit medical certification when requested for a prolonged and otherwise unexplained absence, such a failure has not in the past been thought an insufficient reason for discharging an employee. *See, e.g., Chiaverini v. United States,* 157 Ct.Cl. 371 (1962). Had McDonough worked for the Service for many years rather than just several months, *cf. Power v. United States,* 531 F.2d 505, 209 Ct.Cl. 126 (1976) (unblemished record of 25 years of government service); *Jacobowitz v. United States,* 424 F.2d 555, 191 Ct.Cl. 444 (1970) (22 years of satisfactory service), had the agency not accorded him a fair hearing, *cf. Grimm v. Brown,* 449 F.2d 555 (9th Cir. 1971), or had the agency charged him with an offense, a critical element of which it failed to prove, *cf. Urbina v. United States,* 180 Ct.Cl. 194 (1967), perhaps deference to the agency's choice of penalty would be inappropriate. McDonough does not claim that there are any such circumstances present in this case, however, and we are not aware of any from our review of the record.