**MOORE–McCORMACK LINES, INC.**
v.
**The UNITED STATES.**

**AMERICAN PRESIDENT LINES, LTD.**
v.
**The UNITED STATES.**

**DELTA STEAMSHIP LINES, INC.**
v.
**The UNITED STATES.**

**AMERICAN EXPORT ISBRANDTSEN LINES, INC.**
v.
**The UNITED STATES.**
**Nos. 51–68, 55–68, 74–68 and 75–68.**

United States Court of Claims.
Decided July 16, 1969.

---

Ira L. Ewers, Washington, D. C., attorney of record, for plaintiff Moore McCormack Lines, Inc., W. B. Ewers and J. R. Ewers, Washington, D. C., of counsel.

Warner W. Gardner, Washington, D. C., attorney of record, for plaintiff American President Lines, Ltd., Shea & Gardner and Kurrus & Jacobi, Washington, D. C., of counsel.

Donald Macleay, Washington, D. C., attorney of record, for plaintiff Delta Steamship Line, Inc., Macleay, Lynch, Bernhard & Gregg, Washington, D. C., and Peter A. Greene, Washington, D. C., of counsel.

Warner W. Gardner, Washington, D. C., for plaintiff American Export Isbrandtsen Lines, Inc., Richard W. Kurrus, Washington, D. C., attorney of record; Shea & Gardner and Kurrus & Jacobi, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

DAVIS, Judge;

Four American steamship lines sue to obtain review of construction-subsidy awards by the Maritime Subsidy Board of the Maritime Administration. The claim is that the Board's action was arbitrary and capricious, unsupported by substantial evidence, and reached through procedures which violated constitutional, statutory, and contractual rights. The Government has moved to dismiss, arguing that this court is without jurisdiction to review such an award and that even if it has jurisdiction there is no cause to disturb these particular determinations. The companies resist the motion to dismiss, primarily on the ground that the procedures were fundamentally unfair. We deny the 'Government's motion and suspend further action in this court so that the Maritime Subsidy Board can redetermine the amounts due the four plaintiffs under proper procedures.[1]

## I

### The Merchant Ship Subsidy System

Since at least the turn of the century, United States shipowners and shipbuilders have been unable to compete effectively with foreign shipyards and operating fleets. The higher wage rates for skilled laborers and more stringent safety standards prevailing in this country result in much higher costs for the production of ships; higher seamen's wages, more protective working conditions, and greater food, outfitting, in-

[1]. Because all parties have relied on materials outside of the pleadings, we consider the defendant's motion (as well as those of the two moving plaintiffs) as for summary judgment. Rule 20(b).

surance, and repair costs make it impossible for a shipowner operating in foreign commerce to compete with ships under foreign flags.[2] Indirect and direct subsidies given shipyards and operating fleets by other nations further aggravate the disparity in costs. As this competitive reality became apparent, the reaction of the American shipping industry was to have its ships built abroad, registered under foreign flags, and manned by foreign seamen.

After World War I, during which this country's military efforts suffered from lack of an adequate merchant navy and trained sailors, Congress decided that the national security required a sound merchant marine, to protect foreign trade, to develop American seamen, and to provide support for the armed forces in time of war or national emergency. Congress also deemed essential to preparedness a modern, efficient shipbuilding industry, capable of providing military vessels in periods of stress. To stimulate the building of new ships and to maintain a merchant marine under the United States flag, the Jones-White Act of 1928, 45 Stat. 689, provided for construction loans and an indirect subsidy through ocean-mail contracts to vessels giving regular foreign shipping service. Reported abuses by the subsidized companies resulted in extensive investigations, and in 1936 Congress chose to replace the hidden subsidy of the ocean-mail contracts with direct subsidies to equalize the position of American-flag and foreign-flag ship-owners with respect to operating expenses, construction costs, and foreign subsidies.

Although the details of the legislation have been changed frequently, the basic concept has remained the same—a government authority is empowered to enter into contracts with American ship-own-

ers to provide an operating-differential subsidy, a construction-differential subsidy, and a special subsidy to meet extraordinary aid to foreign shipping lines by their governments.[3] The purpose of each subsidy is to put the American-flag owner on a parity with his foreign competitor; he is to get his ship for the price his competitor would pay,[4] his labor and operating expenses at the foreign rate, and he is also to be in a position to neutralize any extraordinary help received by his competitor. The Federal Government bears this burden of the higher cost of constructing and operating the ships. In turn, the subsidized ship-owner shoulders. a number of obligations, chiefly the maintenance of the vessel under United States registry.

Although they appear in separate sections of the Merchant Marine Act, and are meant to serve separate functions, the operating and construction-differential contracts are closely interrelated. An owner accepting construction aid agrees to keep his ship under the American flag for twenty years, an obligation he would and could probably not assume were it not for the operating subsidy. Conversely, there is an intimate connection between the plaintiffs' long-term (20-year) operating-differential contracts and their construction agreements. In general, no vessel is eligible for this operating subsidy unless constructed in an American yard. In order to guarantee the replacement of obsolete vessels and further stimulate construction in American shipyards, the operating contracts set out for each operator, a schedule of new vessel construction. The owner is obliged to meet this schedule, or subject its operating subsidy contract to cancellation, if the Government supplies a construction-differential subsidy for each replacement ship.

---

2. This is not so true of ships plying the domestic and intercoastal trades, which are specially shielded from the competition of foreign-flag ships.

3. See §§ 501–05, 601–03, 604 of the Merchant Marine Act of 1936, ch. 858,

49 Stat. 1985, 46 U.S.C. §§ 1151–55, 1171–73, 1174 (1964).

4. Subject, always, to the limitations imposed by the statutory maximum for the construction-differential subsidy of, at present, no more than 55% of the domestic price.

## II

*Determination of the Construction-Differential Subsidy*

The present litigation concerns the construction-differential subsidy. That type of award is defined in the Merchant Marine Act as an amount which "may equal, but not exceed, the excess of the bid of the [low-bid responsible domestic] shipbuilder * * * over the fair and reasonable estimate of cost, as determined by the Secretary [of Commerce], of the construction of the proposed vessel if it were constructed * * * in a foreign shipbuilding center which is deemed by the Secretary to furnish a fair and representative example * * *", but in no event more than 55% of the domestic cost. 46 U.S. C. § 1152(b) (1964) (§ 502(b) of the 1936 Act).

All parties agree that the determination of the cost of building a ship to American specifications in a foreign shipyard is a very complex and conjectural computation. Few if any such vessels are built abroad; the man-hours required to do a particular task here and overseas may be entirely different; the relative priority given to use of more materials or more skilled fabrication of limited materials varies; the practices as to overhead allocation and profit are not the same; the factors determining the amount of profit will vary with the economic circumstances in each foreign shipbuilding center, and perhaps in the world market at any precise moment in time. Despite these difficulties, Con-

gress has felt that a case-by-case determination is the proper way to achieve parity for the owner.[5] Both the Maritime Subsidy Board and the owners have therefore developed elaborate systems for estimating the foreign cost (in economic terms it is actually the foreign "price") of a proposed ship. One method, used extensively by the owners, is to obtain a great deal of detailed information on the costs of the myriad components of the ship in the foreign shipbuilding center. From this data they compute a hypothetical low bid for their ship in that location. The Board and its staff use this method on occasion. They are also reported to employ other estimating methods, calculating from purchased bids or known foreign ship prices the prices per weight unit of major types of components for a particular time period. This method, according to the Board, is more useful for the greater number of different ship prices to be estimated by it, and obviates the gathering of detailed quotations on each ship. A third means for both owners and Board is to extrapolate from the known prices of foreign ships built abroad to the probable costs of an American ship with different capacity, weight, speed and other features, taking into consideration different contract terms, economic conditions, and particular competitive situations. This can produce a rough estimate of the foreign price, and is said to be used to check results reached by the other methods.[6]

The issues for us, at this time, do not revolve around the content of these esti-

5. There were suggestions during the original consideration of the Act that a standard percentage be set. Hearings on S. 2582. Before the Senate Comm. on Commerce, 74th Cong., 1st Sess., pt. 4, at 504 (1935). Similar proposals have been made since. Hearings Pursuant to S. Res. 50 and on S. 2786 Before a Subcomm. of the Senate Comm. on Interstate and Foreign Commerce, 81st Cong., 2d Sess., pt. 2, at 171, pt. 7, at 1706 (1950) (recommendations of President's Advisory Comm. on the Merchant Marine, 1947, and Maritime Commissioner Coddaire, 1950); Arthur D. Little, Inc.,

Ship Construction Differential Subsidies 155–77 (1961) (report prepared for the Maritime Admin., U. S. Dep't of Commerce) [hereafter referred to as Arthur D. Little, Inc., Report.]

6. *See generally* Arthur D. Little, Inc., Report 95–140. This Report was a comprehensive study of the practices of the Maritime Administration (and its predecessors) under the construction-differential subsidy provisions of the Merchant Marine Act. The defendant relies heavily on this study.

mating systems, but rather the procedures used by the Maritime Administration and the Maritime Subsidy Board. In the four cases, the procedure for reaching a construction-differential subsidy figure was substantially the same. The owner prepared plans and specifications for each ship according to the replacement schedule of his operating-differential contract. The plans were then examined and approved by the Maritime Administration and the Navy, and adjustments made for national defense purposes (for which changes the Government would pay the entire cost). Then the plans were released to domestic shipyards for bids, and a low-bid yard chosen. At the same time the Division of Estimates of the Office of Ship Construction of the Maritime Administration prepared a staff report concluding that Japan was the representative foreign shipbuilding center,[7] and the amount of the foreign cost if the ship were built there. The ship-line then requested review of this estimate by the Maritime Subsidy Board, the body responsible for making subsidy determinations.[8]

Because there was not time to review the matter before the shipyard's bid expired, the Board agreed in each instance to set unilaterally a provisional rate, to be redetermined thereafter at the owner's option. Contracts were then made

between shipbuilder, owner, and Government, calling upon the owner to pay the staff's foreign-cost estimate, subject to redetermination by the Board. The Government was to pay the builder the difference between the foreign cost and the bid price.[9] The shipyard was thus assured of receiving the full amount of its bid, in part from the owner and the rest from the Government. What remained for final decision was the division between the plaintiff-owner's share and that of the Government.

Since each owner has a direct interest in having the foreign-cost determined to be as low as possible (its ultimate obligation being to pay only that amount), the plaintiffs all had consultants prepare elaborate data on Japanese shipbuilding costs as of the time of the shipyards' bidding on the construction contracts. This information was given to the Division of Estimates of the Maritime Administration and informal conferences were held between representatives of the owner and the Chief of that Division. According to the plaintiffs' assertions— which we must accept since the defendant does not controvert them—the Division did not, in any meaningful way, reveal its own thinking, studies, or estimates to plaintiffs except to suggest the ultimate conclusion that the owners' foreign-cost estimates were too low in totality.[10] Cut off by this administra-

---

7. All parties agree that this is correct.

8. Through delegation of the powers conferred upon the Secretary of Commerce by Reorganization Plan No. 7 of 1961, 75 Stat. 840, by his Departmental Order No. 117. 31 Fed.Reg. 8087, 15331 (1966).

9. A representative contract between owner and Government provided in Article 1(b): "The Board hereafter will, at the option of the Owner, review its determination under Section 502 of the Act, giving consideration to any evidence submitted by the Owner within thirty (30) days from the date of this contract, and in the event said review results in a change in the dollar difference between (a) the Board's final determination of the estimated fair and reasonable price for constructing each of the Vessels in Japan (exclusive of the national defense features) and (b) the fixed price bid of

[the shipbuilder] for the Construction of each of the Vessels (exclusive of the national defense features) set forth in Article 1(a) (i), this contract shall be amended to incorporate the changed dollar difference * * *. In no event shall the grant under this Article 1 exceed 55% of the total cost of constructing the Vessels * * *."

This provision is from the American President Lines' contract. The Delta and Moore-McCormack contract provisions were much more abbreviated, but expressed the same general understanding that only a tentative rate, subject to further determination by the Board, was being set at that time.

10. In at least the instance of American President Lines, the Government personnel discussed certain individual items in the owner's presentation, only to indi-

tive curtain, each owner demanded to see the Division's itemized estimate and its underlying data, or at least to be told of the specific areas in which the owner's estimate was considered too low. The Division refused on the grounds that its data was from confidential sources, that the computation was at any rate not subject to exactness, and that the owner was not entitled, by statute or by the rules of the Board, to anything other than the right to make its own presentation (a right which had been accorded).

The plaintiffs then asked the Maritime Subsidy Board for a re-determination of the Division's conclusion, and complained of the procedures used. American President Lines, for example, made detailed procedural requests, including a hearing before a hearing officer, a disclosure of the Division's estimate and the evidence on which it was based, an answer to the Lines' specific arguments which would cover the points of disagreement, and an opportunity to make an oral presentation before the Board itself. The Board sustained the determinations of the Division without indicating anything more, in substance, than that it had considered and rejected the plaintiffs' presentations to it. The procedural requests were all denied. The Secretary of Commerce, on petition, refused to review the determinations. These suits followed.

## III

### Is Judicial Review of Board Procedure Precluded?

■ The Government nails its main defense to the stark proposition that there can be no significant judicial examination of either the substance of the Maritime Subsidy Board's determinations or of the procedures by which they were developed. At least for the procedural face of these cases—which is all that we consider at this stage of the litigation—we reject that basic postulate as inconsistent with the subsidy statute, as well as with the plaintiff's government contracts. The judicial review provision of the Administrative Procedure Act, Section 10, 5 U.S.C. § 1009 (1964) (recodified as 5 U.S.C. §§ 701–06 (Supp. IV 1965–68)), assures court scrutiny of agency action to any legally affected person [11] "except so far as ['to the extent that' in the new section] (1) statutes preclude judicial review; or (2) agency action is by law committed to agency discretion." [12] This mandate for judicial review is to be read hospitably, not restrictively. Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S. Ct. 1507, 18 L.Ed.2d 681 (1967); Shaughnessy v. Pedreiro, 349 U.S. 48, 51, 75 S.Ct. 591, 99 L.Ed. 868 (1955). We must look carefully, therefore, to see whether the Merchant Marine Act actually does preclude review and precisely

cate in the end that, in any event, even if the plaintiff's position on those particular points was sound, the estimate was too low in other unstated respects, so as to more than offset any error in the specific objection by the Division. There is no suggestion in the moving papers or briefs that the other plaintiffs received any substantially different treatment.

11. Defendant correctly concedes that plaintiffs have standing to sue.

12. The pertinent parts of § 10 (as it appeared in the 1964 Code) were (there have since been changes in form but not in substance, at least for our purposes):
   "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—
   "(a) Right of review
   "Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.
   \*  \*  \*  \*  \*
   "(e) Scope of review
   So far as necessary to decision and where presented the reviewing court shall \*  \*  \*  (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; \*  \*  \* (4) without observance of procedure required by law; \*  \*  \*."

what it commits to Board discretion. In this connection, we have also to concern ourselves with plaintiffs' contracts.

■■ A. *The Merchant Marine Act —Preclusion of Judicial Review:* The Act does not in terms provide for judicial review of a construction-differential subsidy determination by the Maritime Subsidy Board, nor does it contain any language expressly limiting or precluding such review. But it is now commonplace that the mere absence of a review provision evidences no intent to withhold review. Abbott Laboratories v. Gardner, *supra*, 387 U.S. at 140–141, 87 S.Ct. 1507; Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733 (1944); H.R.Rep. No. 1980, 79th Cong., 2d Sess. 41 (1946) (on Section 10 of the Administrative Procedure Act). On the contrary, "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, *supra*. "To preclude judicial review under this bill [the Administrative Procedure Act] a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it." H.R.Rep.No. 1980, *supra*. *See also* 4 K. Davis, Administrative Law Treatise, §§ 28.07–08 (1958); L. Jaffe, Judicial Control of Administrative Action, 336, 373 (1965).

1. To meet this high standard, the Government adduces the four specific instances of judicial participation (with respect to an administrative decision) in this lengthy Act as proving that court review was not to be otherwise available. These scattered provisions, however, are all too far removed in subject-matter from the construction-differential subsidy to give any "persuasive reason to believe" or "clear and convincing evidence" that Congress signified any purpose to bar review in the situation before us.

Half of the four instances were in the original 1936 Act, and both involved the judicial determination of just compensation for Government takings—a matter usually dealt with specifically in legislation authorizing the use of eminent domain, and as to which court consideration is constitutionally required. Of these original provisions, one was for review in this court of payments for the termination of the previous ocean-mail subsidy contracts which the new Act cancelled. See 46 U.S.C. §§ 1142(b) and (c) (1946). This clause had nothing to do with the implementation of the new subsidy system established for the future, but only with the clearing up of the old, cancelled mail contracts which were being abruptly cut off by Congress and put in the dust-bin.

The second original provision is § 902, now found in 46 U.S.C. § 1242 (1964), dealing with the amount to be paid a shipowner when a vessel is requisitioned in time of war or public emergency. As originally enacted, the section contained general guidelines for determining the amount of just compensation, allowing the owner to sue in any court of competent jurisdiction if he was dissatisfied with the award. Later amendments added detailed standards and specified the method for determining claims of third parties based on mortgages and attachment liens, also limiting such suits to admiralty courts. The section appears in Subchapter IX, dealing with miscellaneous provisions, and plainly has no relation to the operation and management of the subsidy system set out in Subchapters V and VI. The third clause to which the Government draws our attention, § 1212, 46 U.S.C. § 1292 (1964), is part of a new Subchapter XII appended to the Merchant Marine Act in 1950, authorizing the Secretary of Commerce to provide insurance against war risks and specifying that suit should be brought only in admiralty courts if claims are not amicably settled. Obviously, this provision, too, is entirely separate in structure and in purpose from the subsidy determinations under the Act.

The last instance of express judicial review in the Act is § 611, 46 U.S.C. § 1181 (1964), added in 1938. That provision

is part of Subchapter VI (concerned with operating-differential subsidy arrangements) and provides a method by which shipowners may transfer their vessels to foreign registry, thereby relieving themselves of the added burdens of operating under United States requirements, if the United States should default on its obligations or cancel an operating-subsidy contract without just cause.[13] The legislative history reveals, quite openly, the special purpose of this unique provision—an aim wholly unrelated to the administrative determination of construction-differential subsidy. The amendment was proposed by the Maritime Commission after its first study of the Act under which it was to operate. Commissioner Joseph P. Kennedy testified before the House Committee on Merchant Marine and Fisheries that the opportunity to transfer to foreign registry was meant to relieve owners in the event the Government changed its entire merchant marine policy and failed to appropriate any funds for the payment of operating subsidies. Hearings on H.R. 8532 Before the House Comm. on Merchant Marine and Fisheries, 75th Cong., 2d & 3d Sess., pt. 1, at 11–12 (1938); see also H.R.Rep. No. 2168, 75th Cong., 3d Sess. 23 (1938). Section 611, then, was designed to protect against Congressional change of mind, not against agency abuses.

The sum of it is that all four of these judicial-review sections deal with review of agency rulings in very different contexts from that of the amount of subsidy due on an existing construction-differential contract. Further, they each provide for limited review in very particular circumstances. The ocean-mail-contract-adjustment and foreign-transfer provisions were aimed at the extraordinary occurrence of a drastic change in governmental policy toward the merchant marine; in addition, they both somewhat qualified the existing right of the holder of a government contract to sue in this court under the Tucker Act. The requisition-compensation section likewise restricted the amount which could be awarded, and otherwise merely provided a procedure for the Secretary to pay part of the compensation pending suit, recognizing, in passing, the otherwise available remedies for judicial determination of the compensation due on a taking. The war risk insurance section was also meant to limit the available civil remedies to an admiralty court proceeding. In none of these very special provisions, singly or together, is there any suggestion, let alone persuasive evidence, that Congress wished to safeguard construction-differential subsidy determinations from court scrutiny.[14]

13. The owner files an application for transfer with the Secretary of Commerce, after which it is entitled to a hearing, the testimony of which is to be reduced to writing. If the application is denied, the owner has a right to appeal to the United States Court of Appeals for the District of Columbia Circuit, which, with the written record before it, "shall have exclusive jurisdiction to determine whether such cancelation or default was without just cause, and to affirm or set aside" the Secretary's order. The judgment or decree of the Circuit Court "shall be final". The Secretary is allowed ninety days from the final decision either to buy the vessels according to statutory formula or to reinstate the contract and settle the default.

14. If other isolated parts of the Act are to be scanned for their impact on the subsidy sections, it would be easier to

hold that Congress has inserted an express finality clause each time it intends that result. See § 802, 46 U.S.C. § 1212 (1964), as amended by Act of June 23, 1938, ch. 600, § 33, 52 Stat. 962, dealing with the value of a ship on which construction-differential subsidy has been paid, upon requisition by the United States, one alternative being the "fair and reasonable scrap value * * * as determined by the Secretary of Commerce * * *. Such determination shall be final" (emphasis added). This phraseology assumes special significance because of the wording of § 502(b), 46 U.S.C. § 1152(b) (1964), which, in defining the construction-differential subsidy, speaks in terms of the "fair and reasonable estimate of [foreign] cost, as determined by the Secretary". The drafters of the 1938 amendment to § 802 apparently felt it necessary (or wise) to go beyond the "as determined by the Secretary" phrasing

Indeed, to hold that the existence of these four clauses impliedly leaves other administrative determinations nonreviewable would mean putting holders of contracts with the maritime agency entirely at the agency's mercy with regard to two other determinations which would traditionally be subject to judicial examination. Section 801, 46 U.S.C. § 1211 (1964), requires a party to any operating subsidy or charter contract to maintain and disclose his books and records to the Board or the Secretary of Commerce, and that "upon the willful failure or refusal of any person * * * to comply [with these provisions] * * * the Secretary of Commerce shall have the right to rescind the contract, and upon such rescission, the United States shall be relieved of all further liability on such contract." Section 805, 46 U.S.C. § 1223 (1964), also sets forth a number of prohibitions and limitations, and adds, in subsection (f), that upon determining that a willful violation has occurred the Secretary may rescind the contract. It is highly unlikely that Congress intended to make such contract rescissions wholly immune to judicial oversight, leaving valuable contractual rights to the unfettered will of one of the parties. Yet that would be the necessary result if defendant were right that the mention of judicial review in one part of this Act bars it in all others.

2. The history of the Merchant Marine Act bolsters the conclusion that no implied preclusion-of-review should be read into the subsidy sections. The understanding which emerges from the numerous bills and lengthy hearings is the other way. The Congress did appear to reject the idea of full determination by the courts of these complex subsidy awards, but it also seemed to contemplate that the judiciary would be available to remedy, at the very least, "abuse

of discretion" or "gross abuse of discretion".

The subject of judicial review for subsidy awards was considered only in connection with the part of the Act treating with yearly readjustment of operating differentials. There is not a word, pro or con, on review of other subsidy decisions. We surmise that the reason for this lack of interest in court review of determinations of construction differential and of the initial operating differential was that it was thought that neither decision would put the shipowner in a vise. In each instance he could protect himself by refusing to enter into a contract on that basis, choosing to build his ship abroad or to take his vessel to foreign registry; in neither case would he be bound by any agreement prior to the determination of the amount of subsidy to be allowed, and he could make his election freely after that administrative decision was made known. Everyone seemed to realize, however, that there had to be some means for adjusting the continuing operating subsidy to meet changed conditions, and all were sensitive to the possibility of unfairness to the contract-bound operators through arbitrary agency redetermination of the annual operating differential. Judicial review proposals were therefore extensively discussed in this context. No one appears, at the time, to have realized that, when an operator is bound under an operating-differential-subsidy contract to replace ships at regular intervals, he is then tied to the decisions of the agency on the amount of construction-differential in the very same way as with respect to the yearly operating subsidy. He cannot refuse to build the ship merely because he is not satisfied with the subsidy award. Thus, the position of the owner is substantially the same as that contem-

---

in order to establish finality. *See also* § 608, 46 U.S.C. § 1178 (1964), which gives the board *"exclusive jurisdiction* to determine the purposes for which any payments made by it under [a contract

voluntarily or involuntarily passing out of the control of the original holder without the consent of the Board] shall be expended." (emphasis added).

plated in connection with readjustment of the operating differential, and we are justified in measuring Congress' putative attitude toward judicial review of construction-differential rulings by its action in the closely analogous area.

Within the maximum respectable length of an opinion, we could not give even a concise chronological summary of the course of this subject through the Congressional consideration of the Merchant Marine Act. But that history does show that the House and Senate committees had before them some seven alternative suggestions with regard to the judicial review of agency determination of the readjusted operating differential subsidy rates—running the gamut from absolute non-review to detailed procedures for review by the district courts or the courts of appeals, and suits in the Court of Claims.[15] Although there were numerous proposals for specific review-language, and most bills contained lengthy clauses on this subject, the final solution was to leave the matter entirely uncovered in the terms of the 1936 Act. This solution had been put forward by representatives of the Commerce Department, and their interpretation of the absence of express review-language, according to their testimony before the legislative committees, was that this would leave the subsidy determinations final, *except for abuse of*

*discretion, or gross abuse of discretion* in which event court review would be afforded according to the ordinary processes of law.

J. C. Peacock, Director of the Shipping Board Bureau of the Department of Commerce, suggested the deletion of the complex review-procedure originally proposed, involving three-judge district courts and direct appeal to the Supreme Court, stating:

> MR. PEACOCK: We have suggested that if there is any gross abuse of discretion by the authorities administering this subsidy, the regular processes of law would ordinarily afford a sufficient protection. * * * [16]

During the next session, O. P. M. Brown, a Shipping Board lawyer who served as a consultant for Senator Guffey in drafting the latter's bill, spoke in support of a provision in the Guffey bill making the agency decision final:

> [I]n fact it is customary in Government contracts, building contracts, construction contracts, and so forth, for a similar provision, that is that the decision of the head of the executive department or the board or the bureau shall be final. However, I find that in Senate bill 3500, provision is made that the dissatisfied operator may appeal to the courts.
>
> * * * * * *

---

15. These were (1) absolute non-reviewability (Congressman Sirovich's remarks at a House hearing. Hearings on H.R. 7521 Before the House Comm. on Merchant Marine and Fisheries, 74th Cong. 1st Sess., pt. II, at 701–02 (1935); (2) legislative silence, with review according to the prevailing standard ("gross abuse of discretion") (see discussion in text *infra*); (3) specific language of administrative finality except for gross abuse of discretion (Guffey bill, S. 4110, 74th Cong., 2d Sess. (1936)); (4) three-judge district court review according to the ICC standards (H.R. 7521, as introduced, 74th Cong., 1st Sess. (1935)); (5) court of appeals review with *de novo* evidence (Campbell suggestion, S. 2582 as reported. S.Rep.No. 713, 74th Cong., 1st Sess. (1935)); (6) Court of Claims review accorded under the ocean-mail

contract adjustment clauses (S. 3500 as reported, 74th Cong., 2d Sess. (1936)); (7) Court of Claims review available because of legislative silence (remarks on the floor by Congressman Bland, 79 Cong. Rec. 10087 (1935)).

16. Hearings on S. 2582 Before the Senate Comm. on Commerce, 74th Cong., 1st Sess., pt. 1. at 21 (1935). A later memorandum from the Commerce Department also asked for deletion of any express provision for review, saying that "if [the agency] grossly abuses its discretion, the regular processes of law would ordinarily afford sufficient protection". *Id.*, pt. 2, at 100–01; Hearings on H.R. 7521 Before the House Comm. on Merchant Marine and Fisheries, 74th Cong., 1st Sess., pt. II, at 383–84 (1935).

Of course, even in a contract which provides that the decision of the Authority shall be final, such a decision is subject to review for gross abuse of discretion, even if there is no such provision in the contract.

\*   \*   \*   \*   \*   \*

[A]s I said before, if there is such a provision in the contract that it shall be determined by the Government authority who makes the contract, the decision of that Government authority is subject to review by the courts if the discretion is abused, if it is grossly abused.

\*   \*   \*   \*   \*   \*

In a hairline case, where three fair men might find one way or another, the courts would not say that there was an abuse of discretion.[17]

Moreover, the proposal which most explicitly limited judicial review of readjustment determinations was § 34 of Senator Guffey's bill (S.4110):

(8) that the decisions of the Commission under the foregoing provisions of the contract shall be final and not subject to review in any court *except for gross abuse of discretion* (emphasis added).

Absolute non-reviewability was never proposed except in some casual remarks of one Congressman at a hearing (see note 15, *supra*). The main trend of those opposed to full court re-examination was to restrict judicial review, not to abolish it entirely.[18]

From this history it appears, first, that Congress never contemplated making these sorts of subsidy decisions absolutely final and unreviewable; second, that it was felt in almost all quarters that the absence of express language on review would leave room for judicial scrutiny, at least for abuse of discretion; and, third, that even if express finality language had been placed in the Act, it would have been thought to be subject to an exception permitting a limited judicial review. At the very least, the history demonstrates that there was no positive intention that the agency's decision be completely immune from all judicial review.[19]

3. There is no adequate basis for believing that Congress has taken any stronger anti-review position since the passage of the Merchant Marine Act in 1936. Government representatives have told Committees, in summary terms, that judicial review is available on maritime matters (without any clear indication of the scope of that review).[20] During the floor consideration of Reorganization Plan No. 21 of 1950, Senator Magnuson remarked that the then Board's determination of operating subsidy grants "are final and conclusive, subject only to the possibility of judicial review" (96 Cong.Rec. 7316 (1950)). The defendant thinks that the Senate investigations in 1949 manifested the opposite view, but we do not find it there. The Committee on Interstate and Foreign Commerce looked into the problems of the then Federal Maritime Board, which was mainly being charged at that time with being too generous to the owners. The committee went into great

---

17. Hearings on S. 3500, S. 4110, and S. 4111 Before the Senate Comm. on Commerce, 74th Cong., 2d Sess. 115, 117 (1936).

18. Of the three Senators who sponsored the actual bill which was enacted (Copeland, Guffey, and Gibson), the first two were previously on record, in the prior consideration of the problem, as desiring some measure of court review. Senator Gibson's views do not seem to be of record.

19. We do not decide at this time, since we do not have to reach that issue, whether or not the Board's awards are subject to greater examination than for abuse of discretion.

20. Hearings on H.R. 2915 and H.R. 2916 Before Subcomm. No. 2 of the House Comm. on the Judiciary, 81st Cong., 1st Sess. 137 (1949) ("Providing for the Review of Orders of Certain Agencies"); Hearings on Reorganization Plan No. 7 of 1961 Before the House Comm. on Merchant Marine and Fisheries, 87th Cong., 1st Sess. 18, 58, 72–73 (1961); Hearings on Reorganization Plan No. 7 Before a Subcomm. of the Senate Comm. on Commerce, 87th Cong., 1st Sess. 100–01 (1961).

detail, but received no objection based on the absence of review of subsidy determinations. Consideration was given to the process by which subsidy determinations were reached, in the sense of the data on which they were based, and the formulae by which subsidies were determined, but not in the sense of the procedural rights given to shipowners in the presentation of their evidence of foreign costs.[21] The Committee's final report looked askance at the agency for its failure carefully to consider sufficient evidence of foreign costs. But there was no indication, explicit or implicit, of the immunity of subsidy decisions to judicial review. That subject was not broached.

The same verdict of not-proven goes for the "general understanding" of non-reviewability which the Government draws from the fact that these are the first court attacks on subsidy determinations in the 32 years of the Merchant Marine Act. During most of the first ten years of that period the nation went through the Second World War, which completely suspended the peacetime-oriented programs of the Maritime Commission. Further, most of the objections raised to the policies of the administering agency have been that they were too lenient toward the shipowners.[22] The plaintiffs have also pointed out the great cost of litigating such complex matters as foreign cost determinations, asserting that never before has the agency been so far wrong as to economically justify bringing suits such as these. They also contend that until recently the staff of the Division of Estimates of the Office of Ship Construction was willing to engage in a far greater interchange of information, including disclosure of its estimates and the justification for their component

parts. The ultimate determination was therefore more palatable because understandable and, to some extent at least, rationalized and justified to the subsidized lines. These factors move us to give little weight to the pioneer character of this attack upon a subsidy determination.

B. *The Merchant Marine Act—Administrative Discretion:* We are satisfied, for the reasons just given in Part III, A, *supra,* that the Merchant Marine Act does not cut off all judicial review of construction-differential subsidy determinations. The Administrative Procedure Act also bars judicial review of an agency action to the extent that it is "committed to agency discretion", even though all review may not be wholly precluded by the governing statute. Much discussion and some controversy has enveloped this facet of the Procedure Act in a multitude of contexts, but at the present stage of these cases we are concerned with only a single aspect of the Subsidy Board's discretion. The plaintiffs attack the procedures by which the awards were reached. They do not, as yet, challenge the substance of the determinations since, they say, the lack of fair process deprives them of any rational basis for understanding the Board's results or how it arrived at them; at this point, the assault must perforce converge upon procedure. It follows that the only facet of the Board's discretion which is now before us is its election to establish and pursue the procedural steps it has picked here. Does the Board have unreviewable discretion to set up its own procedures, no matter what they may be?

We need not establish for the first time the importance of procedures. That has already been done often and eloquently. *See, e. g.,* Joint Anti-Fascist

21. *See, e. g.,* Hearings Pursuant to S.Res. 50 and on S. 2786 Before a Subcomm. of the Senate Comm. on Interstate and Foreign Commerce, 81st Cong., 2d Sess., pt. 2, at 170–71, pt. 7, at 1693, 1706 (1950) (proposals of President's Special Advisory Committee on the Merchant Marine,

Statements of Chairman of the Maritime Comm'n, and of a Commissioner.)

22. See Arthur D. Little, Inc., Report 5–6 which concludes that shipowners as of that date (1961) were satisfied with agency decisions in general.

Refugee Committee v. McGrath, 341 U. S. 123, 149, 160–172, 71 S.Ct. 624, 95 L. Ed. 817 (1951) (concurring opinion of Mr. Justice Frankfurter); Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). "[I]n the development of our liberty insistence upon procedural regularity has been a large factor". Burdeau v. McDowell, 256 U.S. 465, 476, 477, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921) (dissenting opinion of Mr. Justice Brandeis). Especially if the merits of the determination may be largely shielded from judicial review (as the Government urges is true here) is it essential that proper procedures precede the administrative decision. In those situations the right to fair process may be the most meaningful right possessed by the affected parties, and at the same time the sharpest goad pressing the decision-maker toward a fair and correct result.

The judiciary, moreover, is peculiarly equipped to act as the guardian of fair process. The courts have had decades, perhaps centuries, of experience in developing and monitoring procedures for all sorts of proceedings. Their expertise in this region of the law is ordinarily greater than that of any one set of administrators; courts deal regularly with a great variety of processes, administrative and judicial, and in that way attain and assimilate a broad knowledge of procedural needs, practices, solutions, and requirements. Expertise in the agency's special substantive field is rarely, if ever, a true prerequisite to oversight of its procedures. Conversely, a feeling for the appropriate procedure does not often seem to be heightened by the administrator's substantive knowledge. Progress and improvement in procedure appear to come more readily from external pressure than from within. The fact is that, once apprised of any special factors to be considered, the courts are more competent to weigh the

procedural balance than an agency which has only its own, necessarily parochial, experience and interests to guide it. *See* 4 K. Davis, *supra*, § 28.21, at 113; L. Jaffe, *supra*, at 565–69.

It is for these reasons that courts have refused, in various circumstances, to agree that particular administrative procedures are wholly "committed" to unreviewable agency discretion, even though there is or may be little scope for court testing of the substance of the decision. *See* Overseas Media Corp. v. McNamara, 128 U.S.App.D.C. 48, 385 F. 2d 308, 314–318 (1967); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F. 2d 570, 575–76 (1964); Hornsby v. Dobard, 291 F.2d 483, 487 (C.A. 5, 1961); Blazina v. Bouchard, 286 F.2d 507, 511 (C.A. 3), cert. denied 366 U.S. 950, 81 S. Ct. 1904, 6 L.Ed.2d 1242 (1961); Ellerd v. Southern Pac. R. R., 241 F.2d 541, 544 (C.A.7, 1957); United States ex rel. Leong Choy Moon v. Shaughnessy, 218 F.2d 316, 318 (C.A. 2, 1954); Bower v. Eastern Airlines, Inc., 214 F.2d 623, 626 (C. A. 3), cert. denied, 348 U.S. 871, 75 S. Ct. 107, 99 L.Ed. 685 (1954); American President Lines, Ltd. v. Federal Maritime Bd., 112 F.Supp. 346, 348, 350–351 (D.D.C. 1953); *see also* American European Agencies, Inc. v. Gilliland, 101 U.S.App.D.C. 104, 247 F.2d 95, 97 (C.A.D.C.), cert. denied, 355 U.S. 384, 78 S.Ct. 152, 2 L.Ed.2d 114 (1957). "Presumptively, an exercise of discretion is reviewable for legal error, *procedural defect* or 'abuse'." L. Jaffe, *supra*, at 363. "Action challenged as a denial of due process—whether substantive in the sense of being arbitrary or by capricious classification, or *procedural in the sense of denying minimum safeguards*—could be immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect." Gonzalez v. Freeman, *supra*, 334 F.2d at 575 (emphasis added).[23]

23. Neither Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958), nor Schilling v. Rogers, 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960)—on which the Government rests heavily—involved a question of review of an agency's procedures.

The Merchant Marine Act demonstrates no such purpose to shut the courts off from examining the procedures used in making a subsidy determination. The discussion in Part III, A, *supra,* proves the point. Congress envisaged, at the very least, review for "abuse of discretion" or "gross abuse of discretion", and by long tradition both of those standards include review for failure to maintain minimal procedural requirements. In addition, there is Congress' insertion of a "fair and reasonable" estimate of the foreign shipbuilding cost as the guideline for the construction subsidy. § 502(b) of the Act, 46 U.S.C. § 1152(b) (1964). "Fair and reasonable" imports fairness and reason in the procedure, as well as in the end-result. Those qualifying terms are wholly antithetic to any absolute discretion in the administrators to set their own process.

C. *Plaintiffs' Government Contracts:* The Merchant Marine Act, as we have just shown, neither precludes all court review of construction-differential subsidy awards nor commits the Board's procedures to its unreviewable discretion. The next step is to take account of the plaintiffs' government contracts. It is masking half the picture to wrench our problem from its contractual background which firmly reinforces the reviewability of the administrative procedures.

The legal reality is that, at this point in their dealings with the Government, the plaintiffs' interest in the subsidy is not a matter of grace or of mere statutory largesse, but of mutually enforceable undertakings. The Government has not chosen to grant subsidy when and if it deems it necessary; it has entered into a twenty-year contract with each of these companies under which it has assumed a number of obligations, and the shipowner has also given valuable consideration, including the promise to replace its ships according to a negotiated schedule.[24] In the operating-differential contract the Government agrees to provide construction subsidy if the vessels are required to be built. And once the plans are approved and a low bidder chosen, the Board enters into a construction-differential contract with the owner, again obligating itself by contract to pay a subsidy in return for undertakings by the owner and the shipbuilder. In a word, the plaintiffs now have a contractual right to the construction subsidy, a right which was potential from the time, several years ago, when they first signed their operating-subsidy agreements. They are not new applicants for a grant which the Government will or will not give, as it wishes. Nor are they bidders for a new contract which the Government may or may not award to them.

The cases which have refused to allow judicial review under the Administrative Procedure Act, on the ground of "discretion", have not concerned the administration of contracts, although several have dealt with the decision by an administrator whether or not to enter into a new contract. *See* Rural Electrification Administration v. Northern States Power Co., 373 F.2d 686 (C.A.8), cert. denied, 387 U.S. 945, 87 S.Ct. 2079, 18 L.Ed.2d 1332 (1967); Rural Elec. Admin. v. Central La. Elec. Co., 354 F.2d 859 (C.A.5), cert. denied, 385 U.S. 815,

---

24. The Senate Commerce Committee report on S. 3500, S.Rep.No. 1721 74th Cong., 2d Sess. 9–10 (1936), contains a section entitled "Subsidy Payments Not a Gift to Shipowner", listing twelve benefits to the Government. This list of benefits to the Government was printed at 80 Cong. Rec. 10075 (1936). Other mention of the *quid pro quo* to the Government appears in Hearings Pursuant to S.Res. 50 Before a Subcomm. of the Senate Comm. on Interstate and Foreign Commerce, 81st Cong., 2d Sess., pt. 7, at 1510–11, 1649–51 (1950).

In any event, it is inaccurate to view the subsidy as simply a bounty to the ship operators. The benefit of the construction-differential subsidy goes largely to the *shipbuilders,* their laborers and suppliers, and to defense preparedness, not to the shipowners, who could get equally good ships built abroad. At bottom, the bounty seems to be to the shipyards, if there is any out-and-out charity.

---

87 S.Ct. 34, 17 L.Ed.2d 54 (1966); Ferry v. Udall, 336 F.2d 706 (C.A.9, 1964), cert. denied, 381 U.S. 904, 85 S.Ct. 1449, 14 L.Ed.2d 286 (1965); American President Lines, Ltd. v. Federal Maritime Bd., *supra*, 112 F.Supp. 346. The latter is, of course, a very different situation. The administrator's choice to contract, where he is allowed but not compelled to do so by statute, is historically entrusted to his business judgment. If improper motivation or violation of his statutory commands is involved, there may be a remedy (*cf.* Overseas Media Corp. v. McNamara, *supra*, 385 F.2d 308); in most instances, however, this sort of decision to initiate action, or to begin a contractual relationship, is left to the administrator, not the courts.[25]

Once a contract has been made, though, the case is entirely different. Both parties have commitments which restrict their freedom of action. Each has surrendered valuable consideration, and is legally entitled to his *quid pro quo*. At this point, the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964), enters to guarantee at least a minimal measure of judicial review of administrative determinations under "*any* contract entered into by the United States" (emphasis added). The express requirement that "a question of law" be open for court examination under every federal agreement (41 U.S.C. § 322) covers most, if not all, major issues of procedure, and, of course, questions of abuse of discretion are subsumed under the review required (41 U.S.C. § 321) for arbitrariness or capriciousness.[26] The court has held that operating-differential subsidy

agreements are to be treated, especially with respect to abuse of discretion, like other government contracts (Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 998, 184 Ct.Cl. 169, 184 (1968) ), and there is no reason for a different handling of construction-differential subsidy contracts. At a minimum, the Board is therefore responsible to the courts for legal errors and abuse of discretion—at least for procedural deficiencies.

## IV.

### Defects in the Board's Procedures

As already indicated in Part II, *supra*, the procedures followed by the Maritime Administration and the Maritime Subsidy Board in these four cases deprived the plaintiffs of any adequate information as to (i) the positions taken and contentions made by the staff (with respect to the estimate of foreign costs) in the staff's ex parte presentation to the Board, (ii) the areas of final disagreement between the staff and the shipowners, and (iii) the decisions of the Board on these disputed issues. The Administration and the Board would not disclose any of their own estimate breakdowns, back-up data, or even the source of such data; nor would they reveal their answers (except to a limited extent in informal oral discussions with the staff) to the plaintiffs' detailed objections and presentations. The staff's final position was never revealed to the plaintiffs and the Board's opinions disclose no more of the actual *ratio decidendi* than may possibly have come out in the prior infor-

---

25. The Government's decision to press for a certain number of replacement ships in the negotiation of an operating-differential contract, and its election, at the time of the scheduled replacement, whether or not to make funds available for construction of the proposed vessel, would thus be less subject to judicial inquiry, if any at all, than the later decision, after construction is begun and the parties bound by contract to pay for it, as to the amount of the subsidy. The existence of this option not to build a scheduled ship shows that the correct moment for the Government to limit the amount of money it wishes to spend for the merchant marine is prior to the approval of vessel construction, and not through the medium of paying less than the true differential after the building process is under way.

26. This is so unless the substantive statute controlling the contract precludes judicial review in whole or in part. We have ruled *supra* that, at least as to procedure, the Merchant Marine Act is not such a statute.

mal staff conferences—which covered only some of the points at issue and left large gaps in the owners' knowledge of the staff's objections and views. In short, the plaintiffs were never really informed of the staff's side of the points at controversy,[27] and were never told the basis of the Board's decision. They are still in the dark.

The Government has centered its attack in this court exclusively upon the notion that a full-blown, adversary, trial-type hearing, complete with presentation of oral testimony and cross-examination and rebuttal of opposing witnesses, is not required. But the plaintiffs do not claim a right to such hearings in ordinary cases. Insofar as they may make such a claim, mildly, in these instances, it is based upon the unusual circumstance of the Board's having already made a final determination of the matter, and therefore (according to claimants) having formed a hard and steadfast adverse position requiring unusual safeguards. What the shipowners seek as due them in the normal construction-subsidy determination is, generally, the right to know the specific components of the staff foreign-cost estimate, enough back-up data to be able to gauge its reliability vis-a-vis the data supporting their estimates, and the objection of the staff to the various items of their estimate (which would be disclosed by comparing the detailed estimates of staff and owner). Plaintiffs do not contend that these disclosures must be made in any formal context, but only that the informal discussions or written presentations actually reach the determinative issues. They claim the right to have a joinder of the issues-in-dispute after the initial formulation of estimates, with the opportunity to present additional materials or arguments addressed to the limited matters

on which they and the staff differ. They do not request cross-examination or other such trial rights, but feel that, once the differences are pinpointed and specific arguments focused on them, it will be incumbent upon the Board, in its decision, explicitly to resolve them (or to explain why the staff and owner are wrong in considering them essential to the determination). In addition, plaintiffs seek the right to make oral presentations to the Board, and to have the Board constrained to act without *ex parte* communications from the staff. It is these procedural claims that we consider in this part of the opinion.[28]

■ A. First, it is very plain that under plaintiffs' contracts and the Merchant Marine Act they were entitled to fair procedural treatment. The direct textual basis for the implication of this right is the statutory and contractual provision for the Secretary to make a "fair and reasonable estimate" of foreign cost—a command not only that the final amount be fair and reasonable, but also that the "estimate", in the sense of the estimating process, be fair and reasonable. Added to that is the clear assumption of the Wunderlich Act that procedural fairness is the right of every government contractor (at least if the administrative determination is to be given any weight). *See* L. Rosenman Corp. v. United States, 390 F.2d 711, 712, n. 2, 182 Ct.Cl. 586, 588 n. 2 (1968); J. D. Hedin Constr. Co. v. United States, 408 F.2d 424, 187 Ct.Cl. 45 (March 1969); Pacific Far East Line, Inc. v. United States, *supra*, 394 F.2d at 998, 184 Ct.Cl. at 184; H. R. Rep. No. 1380, 83d Cong., 2d Sess. 5 (1954), 1954 U.S.Code Cong. & Admin.News, p. 2195 (on the Wunderlich Act).

■■ B. In the situation here, procedural fairness required that plaintiffs

---

27. The plaintiffs were clearly given the right to present any estimates and data of their own which they felt would help the Board in reaching a proper determination; they have been assured, by the Board, that that evidence was considered.

28. In Part V, *infra*, we pass upon and reject the plaintiffs' weak suggestion that they are entitled, in the special circumstances of these cases, to a full trial-type hearing before the Board.

584

be informed of the staff position on disputed issues, and have the opportunity to respond to those contentions before the Board made its final determination. It was not enough to allow the plaintiffs to make a blind presentation, screened off from the staff's arguments. The right to be told your adversary's case is fundamental to a determination of this kind. This was recognized by the House Committee report on the Wunderlich Act when it said: "It would not be possible to justify the retention of the finality clauses in Government contracts unless the hearing procedures were conducted in such a way as to require each party to present openly its side of the controversy and afford an opportunity of rebuttal". H. R. Rep. No. 1380, *supra.*

Because this right-to-know is so basic to fair process, the courts have often read agency regulations and procedures, and the statutes from which they derive, to include comparable safeguards insuring knowledge of the relevant contentions. *See, e. g.,* Greene v. McElroy, *supra,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed. 2d 1377; Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955); Simmons v. United States, 348 U.S. 397, 75 S.Ct. 397, 99 L.Ed. 453 (1955); Urbina v. United States, 180 Ct.Cl. 194 (1967); Camero v. United States, 375 F.2d 777, 179 Ct.Cl. 520 (1967); Gonzales v. Freeman, supra 334 F.2d 570. "[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Greene v. McElroy, *supra,* 360 U.S. at 496, 79 S.Ct. at 1413. In *Simmons*

the Court held that the Department of Justice had to present to a person appearing before one of its officers for a hearing on his right to conscientious objector status, a resume of the evidence against him gathered by the FBI. Congress could not have intended the hearing to be conducted "on the level of a game of blindman's buff." *Simmons, supra,* 348 U.S. at 405, 75 S.Ct. at 402. In *Gonzales,* the holding was that the right to file a statement with the Appeals Board after such hearing necessarily included the right to notice of the recommendations of the Justice Department hearing officer. A meaningful statement would be one "based on all the facts in the file and made with awareness of the recommendations and arguments to be countered." *Gonzales, supra,* 348 U.S. at 415, 75 S.Ct. at 414.

Plaintiffs' was not a situation in which the relevant factors were already known to all parties. The foreign cost computations were complex and abstruse, with a very large number of variables and nuances. The owner could not evaluate with any accuracy all the matters which the staff would consider of importance, much less anticipate or divine the sources from which staff members would draw information (the Board has consistently maintained the secrecy of its sources).[29] It was indeed a "game of blindman's buff", in which like Samson the unsighted owners had to contend with open-eyed opponents. As Judge Tamm recently put it, speaking of a closely analogous situation in the operating-subsidy field: "The backwardness of [the Maritime Subsidy Board's] administrative procedure is appalling." American Mail Line, Ltd. v. Gulick, 411 F.2d 696 (C.A.D.C., Feb. 17, 1969).[30]

---

29. As already noted, the plaintiffs assert, and the defendant does not deny, that the informal conferences did not come close to filling the gap.

30. There is also another, narrower, textual basis for the conclusion that plaintiffs were entitled to be told the staff's position. The construction-differential subsidy contract (between plaintiff and the

Government) gave the owners the option to have the Board "review its determination * * * giving consideration to any evidence submitted by the Owner." By this stage, the owner had already made its original presentation, prior to the Government's first, tentative determination. The line now gained the right to make a second submission whose only usefulness would be to dispute or correct

C.  We perceive no valid objection to this requirement that light succeed darkness.  That the identification of issues and an opportunity to respond to the staff position is not impossible for the Board is shown by its regulations which allow the institution of full and formal hearings where the Board deems necessary.[31]  Full hearings (though possibly not trial-type proceedings) have sometimes been held in the past to determine the matter of foreign cost.  *See* American Export Lines, Inc.—Review and Redetermination of the Sales Prices of the "Independence" and "Constitution", 4 F.M.B. 216, 220, as supplemented, 4 F.M.B. 263, 264, 273 (1952).  And full disclosure of estimates and data has been made in "staff hearings".  American President Lines, Ltd.—Redetermination of Reconditioning Subsidy, 4 F.M.B. 396, 397–98 (1954).  In fact, we understand that full, or almost complete, disclosure of the staff estimate was the general rule during the early 1950's.[32]  As late as 1963, the Board's instructions were that "[i]n the event there is a disagreement as to the estimated foreign construction cost * * * between the staff and the shipowner, the Chief, Office of Ship Construction, shall arrange for a meeting of the staff with representatives of the shipowners to discuss the items included in their respective estimates * * * in order to reconcile the differences if possible"; "[i]f agreement has not been reached on the differences" the staff will indicate to the Board "the amount of differences between the estimates and the precise amount of the differences in cost estimate on individual items"; and "the Board will discuss the matter with the owner involved." [33]

Disclosing in sufficient amounts the staff estimates and the nature of the supporting evidence should not place any undue burden upon the Board or the staff.  The Chief of the Office of Ship Construction is now required by the Board's procedures to determine and submit to it a written report on the matters in conflict between owner and staff.  There would be little additional work necessary to prepare a reply to the owner's submission.  Nor need the data to be supplied infringe upon the Board's desire to maintain the confidentiality of its sources of information.  It can disclose data in a form so as to preserve the identity of the source to whatever extent necessary or in some other way balance the interests of the source and those of the owner in having a fair determination of foreign cost.  In this connection, the staff and the Board can be guided by the very considerable body of learning and the solutions developed over the years by courts and administrative agencies.[34]

---

the staff's contentions.  The owners could not have bargained for an empty right, but rather for an opportunity to make a significant contribution to the redetermination.  There must necessarily, then, be an implied obligation on the part of the Government to disclose the matters really in issue, so that the owners would have a good opportunity to present argument and evidence likely to have an effect upon the ultimate decision.

31.  Rule 7 of the Rules of Practice and Procedure before the Maritime Administration and the Maritime Subsidy Board.  46 C.F.R. § 201.71 (Jan. 1, 1968).

32.  The Arthur D. Little, Inc. report, *supra,* indicates that as the intricacy of the ships increased, and the numbers of items upon which disagreement could be present multiplied, the Board came under great pressure from the operators, who were able to "make strong criticisms", and from the General Accounting Office, which saw too close collaboration between owners and Board.  *See* Arthur D. Little, Inc., Report 113.

33.  "Procedure to be Followed in Connection With Matters to be Submitted to the Federal Maritime Board for Action Concerning the Construction of Ships for Subsidized Ship Operating Companies required by the Provisions of Operating-Differential Subsidy Agreements", dated January 23, 1961 (*see* Arthur D. Little, Inc., Report 104–05).  This 1961 memorandum was superseded in 1963 by a memorandum affording lesser protection.

34.  Whether or not to disclose evidence deemed confidential, and under what form of protective order, have been widely litigated issues.  At times full disclosure is ordered (United States v. Lever Bros.

Our discussion has focused on the hypothetical bid method of estimating foreign cost, *i. e.*, the attempt to construct from known quotations for each item of the ship, together with wage rates, overhead and profit figures prevailing at the time, a bid which would have been made by a foreign shipyard. As already indicated, this is not the only method used by the Maritime Subsidy Board for arriving at foreign costs. We do not mean to confine the Board to this or any other particular method of reaching a fair estimate. However, the owner is entitled to notice of the methods used, individual component parts, and underlying data for any estimate, in order to give it an opportunity to present any countervailing evidence or reasoning it may have.

D. Our primary holding, then, is that the Board's procedures have been so defective as to constitute a gross abuse of discretion and thus to invalidate its determinations. We place this ruling upon the statutes (Merchant Marine and Wunderlich Acts) and on plaintiffs' contracts, not upon constitutional grounds. (The latter we do not reach or consider, according to the accepted scale of priorities in decision-making.) We also hold that these four cases must return to the Board for a redetermination under proper procedures, which have been suggested in this Part and will be spelled out more fully in Part VI, *infra*.

## V.

### Return-suspension or Trial De Novo

We have still to explain why we are not ordering a full *de novo* trial in this court, and also why we are not asking the Board to give plaintiffs a full trial-type hearing.

A. Moore-McCormack, which has not moved for summary judgment, asks us to send the case to our trial commissioner for a full *de novo* trial on all issues pertaining to the construction-differential subsidy. In their motion for summary judgment, American President Lines and American Export Isbrandtsen, while not disavowing a *de novo* trial if the court should think it proper, ask us to send the matter back to the Board for a redetermination under proper procedures (and plainly prefer that remedy). Delta Steamship Lines (which has not

Co., 193 F.Supp. 254 (S.D.N.Y.1961), appeal dismissed, 371 U.S. 207, 83 S.Ct. 304, 9 L.Ed.2d 269, motion for leave to file petition for cert. denied, 371 U.S. 932, 83 S.Ct. 310, 9 L.Ed.2d 272 (1962); United States v. Aluminum Co. of America, 193 F.Supp. 249 (N.D.N.Y.1960), rev'd on other grounds, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. American Optical Co., 39 F.R.D. 580 (N.D.Cal.1966)); a sample of relevant figures is required (Schenley Indus., Inc. v. Institutional Prods. Corp, 16 F.R.D. 13 (S.D.N.Y.1954); Shawmut, Inc. v. American Viscose Corp., 11 F.R.D. 562 (S.D.N.Y.1951)); disclosure is limited to counsel and experts involved in the litigation (Covey Oil Co. v. Continental Oil Co., 340 F.2d 993, 998–999 (C.A. 10), cert. denied, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965); Julius M. Ames Co. v. Bostitch, Inc., 235 F.Supp. 856 (S.D.N.Y.1964); Caldwell-Clements, Inc. v. McGraw-Hill Publishing Co., 12 F.R.D. 531 (S.D.N.Y.1952)); or an independent third party is interposed to summarize the data and reduce it to statistical or chart form which

shields individual competitors (Service Liquor Distrib., Inc. v. Calvert Distillers Corp., 16 F.R.D. 513 (S.D.N.Y.1955); United Parcel Serv., of New York Inc. v. Federated Dep't Stores, Inc., 14 F.R.D. 451 (D.Del.1953)). *See generally* R. Milgrim, Trade Secrets § 7.06 (1968); 4 J. Moore, Federal Practice ¶ 26.22 [3] (2d ed. 1968); VIII J. Wigmore, Evidence § 2212(3) (McNaughton rev. ed. 1961).

For an example of agency practice see the experience of the Federal Trade Commission. H. P. Hood & Sons, Inc., 58 F.T.C. 1184 (1961); The Grand Union Co., FTC Dkt. No. 8458 (Feb. 11, 1963); Mississippi River Fuel Corp., FTC Dkt. No. 8657 (June 8, 1966), rehearing denied, CCH Trade Reg.Rep. 1965–67 Transfer Binder ¶17,612 (July 15, 1966); Lehigh Portland Cement Co., CCH Trade Reg.Rep. ¶ 18,475 (Aug. 1, 1968); Lehigh Portland Cement Co., CCH Trade Reg.Rep. ¶ 18,597 (Nov. 2, 1968). *See generally* Gellhorn, The Treatment of Confidential Information by the Federal Trade Commission: The Hearing, 116 U.Pa.L.Rev. 401 (1968).

itself moved for summary judgment) seeks relief in the alternative—either return to the Board or a *de novo* trial here, whichever the court decides to be appropriate. From these prayers, we take it that all plaintiffs, not only Moore-McCormack, would be entitled to a *de novo* court trial if we were to rule that to be the proper remedy. But we hold that it is not the appropriate relief at this stage.

The Merchant Marine Act specifically reposes the power to decide the matter of construction-differential subsidies, at least in the first instance, in the Secretary of Commerce and his delegees, not in any other tribunal. Section 502(b), 46 U.S.C. § 1152(b), refers to "the fair and reasonable estimate of cost [in the foreign center], *as determined by the Secretary*", and section 504, 46 U.S.C. § 1154, providing for arrangements by a subsidized line to construct new vessels, empowers the Secretary to "become a party to the contract or contracts or other arrangements for the construction * * * and may agree to pay a construction-differential subsidy *in an amount determined by the Secretary in accordance with* [section 1152], and for the cost of national-defense features" (emphasis added). This is the language customarily used when an administrative, rather than a judicial, finding is contemplated, at least initially. The statute's legislative history (see Part III, A, *supra*) makes it quite clear that Congress actually wanted and expected the agency to make the determination, with some judicial oversight but not until after the administrative finding. There is no reason to believe that, under proper procedures, the Board cannot or will not achieve a fair result, taking account of all presentations to it. Nor is there any doubt that the plaintiffs can

and will offer their full case to the Board once the opposing views are revealed.

Moreover, the intricate, specialized, and indeterminate nature of the subsidy determination (see Part II, *supra*) makes it peculiarly appropriate for an expert administrative body with continuing experience in the field to make the first full canvass of the problem. *Cf.* Brown v. United States, 396 F.2d 989, 184 Ct.Cl. 501 (1968); Newport News Shipbuilding & Dry Dock Co. v. United States, 374 F.2d 516, 530–531, 534, 179 Ct.Cl. 97, 115, 121 (1967). Generally, where this is the situation the courts leave to the agency the first gathering and evaluation of the evidence, and the initial making of the determination. *See* McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (May 26, 1969); Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 66, 73 S.Ct. 580, 97 L.Ed. 821 (1953); National Broadcasting Co. v. United States, 319 U.S. 190, 227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 443–445, 50 S.Ct. 220, 74 L.Ed. 524 (1930).

■ In these cases there is the added factor of a contract. Plaintiffs' construction-subsidy agreements carry out the purpose to supply an expert, administrative finding. They each provide for the Board, at the contractor's option, to make a new determination of the estimated cost.[35] We do not decide at this time whether or not there is an implicit "finality clause" in these contracts, so that the Wunderlich Act applies in full force. Nor do we decide whether or not the owners will be entitled to a *de novo* trial in this court once the Board has made its determination after following a proper procedure. What we do hold is

---

35. The American President Lines and American Export Isbrandtsen Lines agreements called upon the Board to "review its determination under Section 502 of the Act, giving consideration to any evidence submitted" by the owner. Delta's contract referred to the Board's "final determination" upon the "Owner's

right to appeal to the Board". Moore-McCormack's agreement was shorter in this respect, providing for the "tentative" subsidy to remain in effect "until the Board shall have determined the estimated foreign construction cost pursuant to the provisions of Section 502 of the Act".

that there should first be a fair and informed Board determination before the court undertakes to consider whether, to what extent, and in what form it can or should tackle the substance of the subsidy award. The doctrines of primary jurisdiction and judicial parsimony fuse with the Merchant Marine Act and the contracts to impel us to this conclusion.

Moore-McCormack cites a number of our so-called "school cases" as pointing toward a *de novo* trial here, without further administrative consideration. See, *e. g.,* Hemphill Schools, Inc. v. United States, 135 F.Supp. 946, 133 Ct.Cl. 462 (1955); Eastern School v. United States, 381 F.2d 421, 180 Ct.Cl. 676 (1967).[36] That litigation involved trade schools which conducted courses for veterans under the "G.I. Bill of Rights" (the Servicemen's Readjustment Act of 1944, 58 Stat. 284) after World War II and were entitled under the statute (as amended) to "fair and reasonable" compensation or the "customary" cost of tuition, to be fixed and paid by the Veterans Administration. Congress established a Veterans Education Appeals Board (VEAB) to hear appeals from schools dissatisfied with the determinations of the Administrator. Nevertheless, this court regularly permitted *de novo* court trials of the issues, with or without appeal to the VEAB. But, as our opinions in the "school" line show, those cases were quite different in several significant respects:

(a) The court held that the appeal to the VEAB was merely permissive, not mandatory, and that suit could be brought even though relief was never sought from that board (Art Center School v. United States, 142 F.Supp. 916, 918–922, 136 Ct.Cl. 218, 221–227 (1956); Empire Inst. of Tailoring, Inc. v. United States, 161 F.Supp. 409, 411, 142 Ct.Cl. 165, 168 (1958) ); here, decision by the Subsidy Board is plainly required by statute and contract, at least in the first instance; the remedy is required, not simply permissive.

(b) The court has expressly noted that *de novo* trials were allowed in the "school" cases at a time when the court construed the Wunderlich Act to permit that practice, and before the Supreme Court's *Bianchi* ruling (United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S. Ct. 1409, 10 L.Ed.2d 652.) (*see* Eastern School v. United States, *supra,* 381 F.2d at 428 n. 8, 180 Ct.Cl. at 688 n. 8); the court never decided, after *Bianchi,* whether a *de novo* trial would or would not be appropriate and, indeed, left that question open (Eastern School, 381 F.2d at 428–429 n. 8, 180 Ct.Cl. at 688–689, n. 8).

(c) The legislation governing the "school" cases merely provided that the decisions of the Veterans Education Appeal Board should be "the final administrative determination", and the court understood that provision, not as providing for true administrative finality, but as "no more than stat[ing] that a Board decision marks the end of the administrative process"; the court sharply differentiated the normal "finality" clause in government contracts (Easter School v. United States, *id.*); here, there is a serious issue (which we leave open) whether the Subsidy Board's determination is entitled to the weight given "disputes" clause findings.

(d) The type of evidence and issues with which the "school" cases dealt were far closer to the ordinary run of this court's business, far less intricate and specialized, than the determination of a construction-differential subsidy; the VEAB was not at all an expert agency, but simply an *ad hoc* appellate tribunal set up because of numerous complaints by the schools against the Veterans Administration; in contrast, the Subsidy Board is an experienced body charged with considering a unique and difficult type of problem, and the Board's sifting of the issues and evidence cannot help but be useful even if we ultimately decide to grant *de novo* review. *Cf.* First Nat'l Bank of Smithfield v. Saxon, 352

36. *Eastern School* lists all the decisions in this series.

590

F.2d 267 (C.A. 4, 1965); Bethlehem Steel Corp. v. Grace Line,, Inc., 416 F.2d 1096 (C.A.D.C., March 6, 1969).

B. Plaintiffs, or some of them, talk a ,bit about a full trial-type hearing at the administrative level—in the special circumstances of these cases which suggest, plaintiffs say, a particular obduracy on the part of the Board toward the plaintiffs (see Part IV, *supra*)—but do not at all press the point. We do not consider it mandatory for the Board on a redetermination of these awards to hold trial-type evidentiary hearings. We have no reason to believe that it will fail to give the owners a full, good faith redetermination of the proper subsidy for these ships upon new and fair proceedings, or that it is now so prejudiced that the protections of a trial-type hearing are required. Full-scale evidentiary hearings would be costly for both parties, time-consuming, and not so surely productive of a fairer, or more accurate, subsidy determination in these cases as to warrant imposition of such a burden. This is an instance, we believe, in which the need, at the administrative level, is not for a formal trial but for better "opportunity for party participation in the determination of the governmental action", for "consultation or conferences, not big open hearings", and for "a detailed statement of what is contemplated, with an invitation for written comments or data". 1 K. Davis, *supra*, § 7.-07, at 433.

## VI.

### *Terms of the Return-Suspension*

■ In the light of the discussion in Part IV, *supra,* we hold that each plaintiff is entitled to disclosure of the issues of disagreement by the Division of Estimates before the Board's action on the staff recommendation as well as a right to present additional material and argument to the Board as to the owner's position with regard to these problems. The disclosure may be in the form of the actual estimate of the staff (as presented to the Board), together with enough supporting data to determine the basis for the staff conclusions (subject to such measures as are determined to be reasonably necessary to protect legitimate confidentiality requirements). This estimate must be sufficiently precise and final so as to preclude the staff from later invoking additional, undefined, or undefinable additional errors in the owner's computations.

In the alternative, the staff may submit to the owner a detailed statement in reply to the owner's estimate giving the staff's specific objections to the owner's submissions, the staff's actual conclusions as to the proper amounts for each item objected to, and sufficient indication of the source of the staff's conclusion to enable the owner to respond effectively to these contentions. We cannot at this time detail the specific data which would be necessary to meet this standard; this must be worked out, at least preliminarily, by the owners and the staff. The answer, also, must sufficiently disclose the government's objections as to preclude a later general reference to "general underestimates" on the part of the owner.

While the prior practice of the Board to make these disclosures in the course of informal conferences between owner and staff has apparently served the purpose of definition and limitation of matters in issue, we believe that, at least in the present cases, certainty, clarity, convenience, and the avoidance of further needless controversy require that this disclosure be available to the owners in writing if requested. We do not intend to preclude the use of additional methods of communication between staff and owner or Board and owner. The informal conference may still serve an important role in reconciling differences, and can be used in conjunction with the required written disclosure. The important point is that the owner must be made aware of all the recommendations and contentions of the staff to the Board, and be given the chance to respond to them.

Also, in order to preserve the protection given the owner by this require-

ment, the staff must not circumvent the disclosure requirement by subsequent changes in position and *ex parte* communications to the Board adopting new arguments or postures, or relying on additional data, the nature of which remain unknown to the owner. The Board can determine either to limit staff communications to the Board to those the contents of which have already been conveyed to the owner, or to require a copy of all later staff communications to the Board (bearing on points in dispute) to be served on the owner, or their contents adequately made known. The guideline is that there should be no contentions made by the staff which remain *ex parte*. The Board can determine, in its discretion, whether or not to allow oral argument (and if so to what extent) in addition to written presentations by the owners and the staff.

As for the Board's own determination, we need say only that we would expect it to show, and not merely say, that the owner's presentations have been fully considered.

Accordingly, we suspend proceedings in this court for ninety days or such other reasonable time as the Maritime Subsidy Board or the parties may request, for redetermination by the Board of the amounts of the subsidy awards due plaintiffs under the contracts in issue in compliance with the procedural requirements set forth above. Defendant's motion to dismiss (which we treat as a motion for summary judgment, note 1, *supra*) is denied, and to the extent indicated the plaintiffs' motions for summary judgment are granted.[37]

NICHOLS, Judge (concurring in part, dissenting in part):

While we are not privy to all the thinking of the Maritime Subsidy

Board, it has been made to appear that the need to preserve the confidentiality of confidential information is the reason why the Board's procedures have been altered in a manner so unsatisfactory to the ship owners. It is common knowledge that some foreign governments tend to be hostile to the gathering of economic and financial data by our country's representatives from within their borders. It is not in Communist countries alone that such inquiries may be frustrated by foreign officials, or if carried on against their wishes may endanger the life or liberty of our agents. Yet the data must be had if the Act of Congress here involved is to be carefully executed. In such circumstances, I am not sure it is prudent for us to give the Board detailed instructions how to proceed, as we do, supposing we have a right to do so. Our position might tend to force the Board to forego receipt of such data henceforward, and make its determinations on the basis of mere guesswork and speculation. I do not see how this court knows that the Board could comply with our instructions and still protect its informants.

Of course, the Board is not the only agency of our Government to use foreign information in its work. Still other agencies must use information from domestic sources they are not at liberty to reveal, *e. g.*, information from required returns and reports by persons other than the one being dealt with. Generally, when this situation exists, common sense dictates that the agency make its determination with no pressure to compromise about due process, and to let any person aggrieved have his *de novo* remedy in the courts. It appears to me that 28 U.S.C. § 1491 gives us jurisdiction to try this case and in the course of doing so, to find the facts to

---

37. Even though Moore-McCormack does not request a redetermination by the Board, we hold it entitled to one. It raised the same procedural issues before the Board, the Secretary of Commerce, and the court, and should have the same opportunity to present its case anew to the Board, with improved procedures,

as the other three companies. We deem this a necessary step in the exhaustion of its remedies. In these circumstances its failure to ask for suspension is not fatal. *See* Aircraft Assoc. & Mfg. Co. v. United States, 357 F.2d 373, 380, 174 Ct.Cl. 886, 898–899 (1966).

the degree necessary. I do not view it as conceptually so difficult, or so far outside our normal mission, to find hypothetically the cost of constructing a foreign ship in some particular foreign country. There could be expert testimony introduced on both sides, I suppose. The Government normally would not have to disclose its confidential information because, as I understand the court's standard, the plaintiffs could only recover by proving abuse of discretion, that is, that the Board's cost figures were clearly outside any permissible range. Defendant might end up offering nothing. Whether courts always realize it or not, they are constantly deciding cases after *de novo* trials, where confidential information used by the agency is never offered in evidence to the court.

I do not suppose my colleagues have any doubt as to our right, in a Tucker Act case of which we have jurisdiction, to conduct a trial *de novo* when the issue is whether an administrative official has abused discretion assigned to him by statute. We do it all the time and routinely when the subject is one with which we feel at home: as a random example, when it is alleged the Secretary of the Treasury has abused his discretion under § 482, IRC of 1954, to reallocate income between parent and subsidiary companies. Young & Rubicam, Inc. v. United States, 410 F.2d 1233, 187 Ct. Cl. 635, (decided May 16th, 1969); Eli Lilly & Co. v. United States, 372 F.2d 990, 178 Ct.Cl. 666 (1967). Here the sticking point is skepticism as to whether we could do a good job in this to us, novel field of law. Personally, I have more confidence in the resourcefulness of counsel, and of our fine commissioners, to frame issues that are feasibly triable in an adversary proceeding governed by the rules of evidence. Sometimes I think we have too much faith in the adversary system of justice, but here we display too little. If a trial is ultimately found to be necessary, we have discredited it in advance.

However, I have no objection to suspending the case as the court visualizes. As we retain jurisdiction, and as the Board will now know we hold, at a minimum, that they cannot claim finality when they have not afforded even partial due process, they may be able to follow the procedures the court specifies, or they may simply settle. Defense counsel made it clear in oral argument that if they must choose, they would prefer to accord the kind of partial due process most of the plaintiffs say is all they want, as against the trial *de novo* in this court which Moore-McCormack desires. Defendant apparently regards that as the worst of calamities. I would favor, however, letting it be known now that we are able to accord complete due process here if need be, so that the agency will not feel we are attempting to force it to make its determinations under a procedure contrary to its better judgment.

COWEN, C. J., joins in the foregoing opinion concurring in part and dissenting in part.